## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| The Nashville Community Bail Fund, | Case No. |
| *Plaintiff*, | |
| v. | |
| Hon. Howard Gentry, Criminal Court Clerk; *in his official capacity*; | |
| *Defendant*. | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## I.  PRELIMINARY STATEMENT

1.     Low-income people arrested and jailed in Davidson County face an unconscionable choice: endure the irreparable harm of pretrial confinement, or struggle to post bail, typically through a commercial surety company that requires a substantial, non-refundable deposit. Every day in Davidson County, hundreds of people remain in jail pretrial simply because they cannot pay an upfront money bail requirement. Pretrial incarceration devastates the individuals detained, their families, and their community. These negative consequences are well established: detention exposes people to violence and unsanitary conditions, stigmatizes them, and renders family and work responsibilities nearly impossible.

2.     Unfortunately, accessing the money necessary to pay bail is not the only hurdle persons in Davidson County jails face to exercise their fundamental liberty interest. Local officials further use the pretrial bail system to collect fines and fees from arrested individuals, their families, and other third parties. Under Davidson County Local Rule Governing Bail Bonds 10(B), Defendant Criminal Court Clerk Howard Gentry garnishes cash bond deposits to collect judgment debts from court costs, fines, and restitution. Pursuant to policies created by his office, Gentry requires that people posting cash bonds acknowledge notice of and agree in writing to any future garnishment. Without a signed form, Gentry's office will refuse to accept a bail bond[1] deposit, and the person on whose behalf bond was to be posted will remain incarcerated. In this manner, Gentry unlawfully uses future garnishment of cash bail deposits as a pre-condition of someone's pretrial release, for the sole purpose of ensuring post-judgment payment of fines, court costs, and restitution.

3.     The Nashville Community Bail Fund ("NCBF" or "Bail Fund") is a charitable organization established in 2016 to free persons from jail prior to trial who cannot afford to pay a money bond requirement, and to end wealth-based detention

---

[1] Plaintiff refers in the Complaint to "bail" and "bond" interchangeably because this case deals with instances in which the form of bail required is a monetary bond. The terms are not otherwise synonymous, however, as courts may set other non-monetary conditions as terms of conditional release or "bail." *See, e.g.,* Harvard Law School Criminal Justice Policy Program, *Moving Beyond Money: A Primer on Bail Reform*, 5–6 (Oct. 2016), https://cutt.ly/Trvw1lG.

2

by demonstrating the ineffectiveness of conditioning pretrial release on the payment of money. To sustain its operation, the NCBF uses a revolving fund that relies on recovering posted bond money at the conclusion of a participant's case. Because the court may forfeit and completely retain posted bonds for those who fail to appear, the NCBF stakes its survival on participants returning to court.[2]

4. The NCBF now faces a threat to its existence unrelated to whether the people it bails out successfully return to court. For years, the Davidson County Criminal Court Judges granted the NCBF an exemption from Rule 10(B). The Criminal Court Judges revoked this exemption on September 30, 2019. Shortly thereafter, Gentry began enforcing both Rule 10(B) and his policy of conditioning acceptance of money bonds on receiving written agreement to garnishment against the Bail Fund. As a result, the NCBF and the persons it frees from jail are now subject to the same injuries local officials have long inflicted upon others.

5. Rule 10(B) and Gentry's garnishment policy violate the Eighth and Fourteenth Amendment rights of those navigating the post-arrest system. The

---

[2] The NCBF is one of several such charitable bail funds operating across the country. *See, e.g.,* The Bronx Freedom Fund, https://cutt.ly/mrdsLbN (charitable bail fund established in the Bronx, New York, in 2007); *Our Mission*, Chicago Community Bond Fund, https://chicagobond.org (charitable bail fund formally launched in 2015); Detroit Justice Center, *Bail Project*, https://cutt.ly/brdsMtB (charitable bail fund in Detroit); Hawai'i Community Bail Fund, https://cutt.ly/jrdduBr (charitable bail fund in Oahu, Hawai'i).

3

policies leverage the duress of pre-trial incarceration to extract tens of thousands of dollars annually from arrested individuals and their support networks, for the sole purpose of maximizing revenue for the court system. These garnishment practices bear no relationship to the constitutionally acceptable purpose of money bail: reasonably assuring court appearance. Gentry's enforcement of these policies harms presumptively innocent people and their support networks by impermissibly taxing pretrial freedom and chilling the posting of bail.

6.     Rule 10(B) and Gentry's garnishment policy also threaten the existence of the NCBF by preventing it from fully recovering the bonds it posts and replenishing its revolving fund. The policies will inevitably bankrupt the NCBF, which will in turn trap people in the Davidson County jails on unaffordable financial conditions of release, with no way to exercise their fundamental pretrial liberty interest.

7.     Rule 10(B) and Gentry's garnishment policy violate the rights of arrested persons and injure the NCBF by: (1) rendering money bail unconstitutionally "excessive," (2) improperly burdening the constitutional right to pretrial release, and (3) depriving the NCBF of property without due process.

8.     Plaintiff NCBF brings this action against Davidson County Criminal Court Clerk Gentry seeking: (1) a preliminary and permanent injunction halting

4

enforcement of both Rule 10(B) and Gentry's additional policies, (2) declaratory relief, (3) attorneys' fees, (4) costs, and (5) any other relief the Court deems appropriate.

## II.        JURISDICTION AND VENUE

9.      The Court has jurisdiction over the claims brought in this action under 28 U.S.C. § 1331, the Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

10.      Venue is proper under 28 U.S.C. § 1391(b)(2) because all parties reside in this District, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## III.        PARTIES

11.      Plaintiff Nashville Community Bail Fund is a Tennessee non-profit corporation founded in 2016[3] and based in Nashville. The NCBF is registered under I.R.C. § 501(c)(3). The NCBF pays cash bail for individuals who cannot afford to do so in order to alleviate the harms caused by unfair wealth-based pretrial detention.

---

[3] The NCBF was initially started as a subsidiary of the non-profit organization Just City, and formally became an independent non-profit entity in 2018.

5

The NCBF deposits the entirety of a person's bail requirement[4] with the Criminal Court Clerk in cash to facilitate their release from jail.

12.    Defendant Howard Gentry is the Criminal Court Clerk for Davidson County. Gentry enforces both Rule 10(B) and his office's policy requiring depositors to acknowledge notice of potential forfeiture prior to posting bail amounts.

## IV.    STATEMENT OF FACTS

### A.    Defendant's Enforcement of The Rule 10(B) Garnishment Policies Improperly Leverages Pretrial Release to Guarantee Revenue

13.    The majority of people arrested and detained in Davidson County must pay a secured bail bond to be released from jail prior to trial. The amount of bail required is typically set by judicial commissioners, but can also be set and/or reviewed by a General Sessions Judge or a Criminal Court Judge.

14.    In Tennessee, monetary bail requirements can be secured in one of three ways: (1) using real property as collateral, (2) depositing the full cash bond amount with the Clerk, or (3) hiring a for-profit commercial surety company, typically for a

_____

[4] As noted above, the Complaint refers to secured, upfront requirements of a payment of money as a condition of release by a variety of terms including "cash bail," "money bail," "cash bond deposits," and "bail bonds." While there are technical differences, for example, between "bail" (a conditional form of pretrial release) and a bond (collateral posted in service of that release) and multiple forms of "money bail" (for example, deposits that are only required in the event of a failure to appear known as "unsecured bonds"), this Complaint pertains only to these upfront requirements of a deposit of money.

6

non-refundable fee equivalent to 10% of the bond amount. *See* Tenn. Code Ann.

§§ 40-11-118(a) and 40-11-122.

15.     Davidson County Local Rule Governing Bail Bonds 10(B) provides:

> Any individual who desires to deposit a cash bond with the Clerk pursuant to TCA § 41-11-118 shall be notified in writing by the Clerk that such cash deposit shall be returned subject to any fines, court costs, or restitution as ordered by the Court. No cash bond may be received in the amount of $10,000.00 or more without notice to the District Attorney General and a hearing in open court pursuant to TCA § 3-9-11-715 [sic].[5]

*See* Local Rules Governing Bail Bonds, Ex. A. The Davidson County Criminal

Court Judges adopted this policy in 2008.

16.     At initial bail hearings in Davidson County, neither the local judges nor

any other official provides notice that money bail paid in cash will be garnished

under Rule 10(B) to satisfy any fines, court costs and restitution assessed. As such,

arrestees have no opportunity to challenge the legality or application of Rule 10(B)

when bail is set.

17.     Typically, people learn about the Rule 10(B) policy when they arrive at

the Clerk's Office seeking to pay a cash bond. There, they receive a document

("Clerk's Form"), promulgated by the Criminal Court Clerk's office, that quotes

Rule 10(B) and further states, in part:

---

[5] The statutory authority for this final provision is Tenn. Code Ann. §39-11-715.

7

I . . . understand this cash bond is subject to execution for satisfaction of all fines, fees, court costs, taxes and restitution assessed against the defendant in ALL matters related to this warrant/case number(s), probation violation or other post judgment issue. I further understand the person tendering the cash bond is due the refund, upon request, once all fines, fees, court costs, taxes, and restitution are satisfied . . .

*See* Clerk's Form, Ex. B.

18.     Gentry will not accept a cash bond payment unless the person paying the bond signs this form. If that person refuses to sign the form, Gentry does not accept the cash bond, and the arrested person remains incarcerated. Further, any effort by someone to first challenge the garnishment scheme would prolong the arrestee's pretrial incarceration by days, weeks, or even months, because the Clerk does not accept bail and effectuate release without agreement to Rule 10(B). Faced with this conundrum, those paying bail are compelled either to sign the form or leave the person they seek to free in jail.

19.     When cash bond payments are made, Gentry enforces Rule 10(B) by automatically extracting from cash bond deposits any court costs, fines, and restitution the court assessed against the criminal defendant when the depositor requests a refund after the completion of the criminal case.

20.     Local officials provide no forum for individuals or the NCBF to challenge the legality of garnishment during the pendency of the arrestee's criminal case or at any other time. And, although an individual may appeal a judgment against

8

her after conviction, there is no forum in which the NCBF can contest the garnishment of its deposited funds to satisfy such a judgment.

21.    In this way, Rule 10(B) and Gentry's garnishment policy exploit individual arrestees and those who seek to pay their bond by leveraging the duress caused by confinement in jail to guarantee future payment of fines, court costs, and restitution. This policy injures arrestees and third parties who pay their bail by conditioning the right to pretrial release upon the future payment of post-judgment costs.

22.    The Rule 10(B) policy generates revenue for Davidson County. Between January 1, 2016 and September 30, 2019, bail garnishments through Rule 10(B) yielded a total of $154,641.77.[6]

## B.    The Rule 10(B) Policies Improperly Burden the Exercise of Individuals' Strong Liberty Interest in Pretrial Release

23.    When a judge sets bail in an individual's criminal case, the judge necessarily deems the individual eligible for pretrial release. An arrested person has a constitutionally protected fundamental liberty interest in pretrial release; once

---

[6] This money appears to have been garnished disproportionately from Latinx people, as noted by the Metro Human Relations Commission in a November 12, 2019 letter.

a money bail condition has been set in an individual's case, she has a further liberty interest in posting bail and securing her freedom.

24.     Rule 10(B) and Gentry's garnishment policy burden the individual right to pretrial release by conditioning an arrestee's pretrial liberty on a guarantee of payment for any future debts. This garnishment scheme is unrelated to the acceptable purposes of bail.

25.     Generally, persons paying an arrestee's bail must accept the risk that they may lose their bail deposit if the arrestee fails to return to court. Rule 10(B) and Gentry's garnishment policy, however, impose an additional financial loss on such persons: they will be forced to pay any court costs, fines, or restitution assessed against the arrestee at the end of the case, even if the arrestee returns to court as required.

26.     The amounts of fines, court costs or restitution that courts assess varies widely based on the individual circumstances of a given case, and can range from a few hundred dollars up to several thousand dollars. Tennessee law grants judges broad discretion to waive these amounts for convicted persons, or to dismiss a case but still require payment of costs. There is no way for those posting bond, such as the NCBF, to predict whether a person will owe court debt at the end of a case, and if so, how much.

27.     Faced with potential garnishment of their bail deposit under Rule 10(B) and Gentry's garnishment policy, third parties otherwise willing to pay a cash bail may choose not to do so. Even if reasonably assured that an arrestee will return to court, many individuals may be unwilling to risk losing some or all of their bail deposit to satisfy the arrestee's post-judgment debt. In such cases, an arrestee remains in jail unless she can secure another option for release. Those unable to post an alternative form of bond often plead guilty in exchange for release.[7]

28.     The garnishment scheme also burdens the exercise of individual liberty rights by incentivizing people to enter exploitative contracts with commercial bail agents. Rather than risk losing the full amount of their bail deposit, even if the arrestee returns to court, individuals and third parties may opt to pay a smaller non-refundable fee to a commercial surety company, which is not subject to the garnishment scheme. When arrestees and their families post bond with a commercial surety, they are often subjected to additional terms and conditions such as private

_____

[7] *See, e.g.,* Megan Stevenson, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention* 3–4 (July 2016), https://cutt.ly/Qe3WPjm (finding incarcerated misdemeanor arrestees are 25% more likely than similarly situated persons to plead guilty and 43% more likely to be sentenced to time in jail); Mary T. Philips, Ph.D., New York Criminal Justice Agency, Inc., *A Decade of Bail Research in New York City*, 116 (August 2012), https://cutt.ly/6e3WDrE ("The data suggest that detention itself creates enough pressure to increase guilty pleas without the need for the extra inducement of a reduced charge.")

11

location monitoring, telephonic and personal check in requirements, submission to arrest for any reason, and additional fees.

## C. The NCBF and the Persons It Frees From Jail are Now Injured by the Local Garnishment Scheme in the Same Manner as Others

29. The NCBF is a charitable organization established in 2016. The NCBF uses a revolving fund to pay secured cash bail deposits on behalf of persons who would otherwise remain in jail because they cannot afford bail.[8] The revolving fund model depends on the NCBF receiving full refunds of the bail it posts when a case concludes, which the NCBF then uses to pay another bail.

30. Shortly before the NCBF began operations, the Criminal Court Judges of Davidson County promulgated a rule exempting the Bail Fund from Rule 10(B)[9]. *See* 10(B) Policy Orders, Exs. C, D. The NCBF operated successfully under that exemption for the next three years, receiving full refunds of its bail deposits in cases that reached a conclusion.

---

[8] Historically, the NCBF posted bail amounts up to $5,000, but it has reduced its individual limit to $2,000 to, among other things, mitigate its losses due to garnishment.
[9] The Davidson County Criminal Court Judges set bail policy for Davidson County pursuant to, *inter alia*, Tenn. Code Ann. § 40-11-123, which gives them the power to regulate the sufficiency of sureties.

12

31.    On April 17, 2019, the Criminal Court Judges held a meeting with representatives from the NCBF to decide whether to rescind the policy exempting the NCBF from Rule 10(B).

32.    On May 6, 2019, the Criminal Court Judges rescinded the NCBF's exemption from Rule 10(B), based on an apparent concern that the total dollar amount of bail posted by the NCBF in conditional forfeiture status was too high.[10] *See* Preliminary 10(B) Policy Order, Ex. C. The Criminal Court Judges did not explain how revoking the NCBF's exemption from Rule 10(B) would address their conditional forfeiture concern, let alone promote court appearances by individuals whose bail is posted by the Bail Fund.

33.    The NCBF requested that the Criminal Court Judges reverse their decision. However, after another court meeting, the Criminal Court Judges denied the request on August 29, 2019. Ex. D. Once again, the judges expressed their apparent concern about conditional forfeitures, and did not explain how revoking the NCBF's exemption from Rule 10(B) serves to promote the purpose of bail.

---

[10] Though it is immaterial with respect to the constitutional claims set forth in this Complaint, the proportion of NCBF bail deposits in conditional forfeiture cited by the Criminal Court Judges status is artificially inflated. The Criminal Court Judges are authorized to set cases on for final forfeiture hearings after a conditional forfeiture is noted, but did not do so in a number of the Bail Fund's cases. The NCBF addressed this point in its materials requesting the Criminal Court Judges to rescind their policy decision.

13

34.    The decision to eliminate the NCBF's exemption from Rule 10(B) became final on September 30, 2019. Since then, Gentry has required NCBF representatives seeking to pay cash bail to sign the Clerk's Form. NCBF representatives comply, but only because Gentry's office refuses to accept the bail payment otherwise, and the person whose bail they seek to pay would then remain in jail. NCBF representatives note on the Clerk's Form that they are signing "under protest." *See, e.g.*, Z. Garcia Clerk's Form Sept. 30, 2019, Ex. E (noting the Bail Fund signed under protest, and requesting a hearing prior to garnishment).

35.    The NCBF now does not deposit more than $2,000 on behalf of an arrestee. The NCBF lowered its previous $5,000 bail ceiling to limit its potential financial losses under the garnishment scheme. Further, in light of its projected losses under the garnishment policies, the NCBF instituted a $20,000 monthly cap in January 2020 on the total amount of bail it will post. By comparison, in 2019 the Bail Fund posted an average of $67,312.50 in bail each month. As a result of the new monthly cap, persons for whom the NCBF would have posted bail but for the garnishment scheme will now remain incarcerated.

**D.    The Rule 10(B) Garnishment Policies Perpetuate a Two-Tiered Pretrial System, Causing Widespread Individual and Systemic Harms**

14

36.     Rule 10(B) and Gentry's bail garnishment policy contribute to a large-scale system of pretrial detention, which will only worsen as the NCBF's operations decrease.

37.     In 2019, there were 24,860 physical arrests[11] in Davidson County. Under local practice, pretrial liberty for most arrestees is determined by whether they can access enough money to post a secured bail requirement set by a judicial commissioner or judge.[12]

38.     In 2019, only 23% of those arrested in Davidson County were released from jail pretrial without being required to meet a monetary condition.[13] Another 30% of arrestees met the financial condition of their release by paying a

---

[11] Criminal Justice Planning of Nashville and Davidson County, *Monthly Criminal Justice Report*, (Jan. 21, 2020). "Physical arrest" means the person was taken into custody and booked into jail. There were an additional 12,442 arrests in Davidson County during the same time frame by state citation or criminal summons. *Id.* Persons arrested by citation or summons are not taken to jail.

[12] *See, e.g.,* Southerners on New Ground Nashville, *Courtwatch Mini Report*, (documenting 114 bail hearings in 2019, finding secured bail requirements imposed in 93% of cases) (Dec. 2019), https://cutt.ly/vrj4mrT; Letter from Civil Rights Corps to Jon Cooper, Director of Law, Metropolitan Government of Nashville and Davidson County (outlining "Metro's reflexive use of secured financial conditions in almost every single case…") (June 21, 2017), https://cutt.ly/zrOIqug.

[13] 19% of arrestees were released under the supervision on the Davidson County Pretrial Release Program, and 4% were released on their own recognizance. *See* Criminal Justice Planning Report, *supra* note 11; Metropolitan Government of Nashville and Davidson County, *2019 CJIS Report Bond Release Totals* (Feb. 4, 2020).

nonrefundable deposit to a surety company. Less than 3% of arrestees secured their release through a cash or property bond.[14] The remaining 44% of arrestees remained in jail pretrial, most because they could not access the money necessary to pay a secured bail requirement.

39.     Davidson County's reliance on secured bail creates a two-tiered system in Nashville, where those with access to money are able to obtain their pretrial liberty, while those without access to money cannot. As discussed below, those jailed and their families suffer compounding harms. The scope of the problem is substantial. On the average day in 2019, more than 900 people (almost 60% of the entire jail population)[15] were incarcerated in Nashville's jails awaiting trial, most because they could not pay their secured bail.

40.     Secured money bail does not promote public goals of assuring court appearance and effectuating speedy pretrial release. In a study replicated in two jurisdictions, there was no meaningful difference in court appearance rates[16] among similarly situated individuals based on whether they posted a secured or unsecured

---

[14] 2019 CJIS Report, *supra* note 13.
[15] This statistic excludes "locally-sentenced felons," who are persons serving state prison sentences of 1-6 years in the Metro CCA Detention Facility.
[16] The output variable researched in these available studies—failure to appear—is a proxy for the central concern at the time of a bail decision, which is the risk of intentional flight.

16

bond.[17] Secured bail requirements, however, increase pretrial detention, and even

short-term pretrial detention is associated with *more* failures to appear and arrests

during the pretrial period.[18] Multiple federal courts, including the Fifth Circuit Court

of Appeals, have recognized the validity of these research findings,[19] and further

---

[17] Michael Jones, Ph.D., *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (Oct. 2013), https://cutt.ly/Se3WGqK (controlling for risk level and finding that persons released on unsecured bonds performed as well as those released on secured bonds in terms of court appearance rates); Brooker, Claire M. B., et al*., The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds* (June 2014) (finding the same in another jurisdiction); *see also* Claire M.B. Brooker, *Yakima County, Washington Pretrial Justice System Improvements: Pre- and Post-Implementation Analysis*, 6 (Nov. 2017), https://cutt.ly/3e3YW8M (observing similar rates of court appearance, but increased release, after reforms implemented that utilized unsecured bonds more frequently).

[18] Christopher T. Lowenkamp et al., Laura and John Arnold Foundation, *The Hidden Costs of Pretrial Detention* 4 (Nov. 2013), https://cutt.ly/4e3YVvR (concluding that longer pretrial detention is associated with the likelihood of failure to appear pending trial); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 15, 21 (Aug. 18, 2016) https://cutt.ly/Ae3YN0J ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear.")

[19] *See, e.g.*, ODonnell v. Harris Cty., Texas, 251 F. Supp. 3d 1052, 1120 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018) (referring to evidence of the efficacy of unsecured bonds as "the most recent and credible evidence"); *Schultz v. State*, 330 F. Supp. 3d 1344, 1362–63 (N.D. Ala. 2018) (discussing studies evaluating efficacy of unsecured bonds and concluding that "most defendants released without financial incentives to appear in court still appear at a very high rate."); *McNeil v. Cmty. Prob. Servs., LLC*, 2019 WL 633012, at *14–15 (M.D. Tenn. Feb. 14, 2019) (Citing expert report of Dr. Michael Jones, finding evidence that short-term pretrial detention yields higher failure to appear rates persuasive); *Dixon v. City of St. Louis*, 2019 WL 2437026, at *15 (E.D. Mo. June 11, 2019) (summarizing and adopting evidentiary findings from *ODonnell*, *Schultz*, and

noted the overwhelming success of persons whose release is secured by a charitable bail fund.[20]

41. Pretrial detention due to inability to pay money bail also has significant negative consequences. Those incarcerated have difficulty conferring with attorneys to defend their case, face mounting pressures as work and family responsibilities go untended, are unable to provide for their own medical needs or those of dependents, and are left in unsafe and unsanitary conditions.[21] Controlling for other factors, pretrial incarceration is the single greatest predictor of a conviction: many people

*McNeil*); *see also Buffin v. City and Cty. of San Francisco*, 2019 WL 1017537, at *22 (N.D. Cal. March 4, 2019) (finding defense expert testifying to efficacy of release on surety bond based on unrelated proxy data "less reliable and persuasive than other data presented").

[20] *See, e.g.*, *ODonnell*, 892 F.3d at 153, 159 (upholding district court factual findings, including regarding high court appearance rates of persons whose bail is paid by charitable bail funds in New York City), *see ODonnell v. Harris Cty., Tex.*, 251 F. Supp. 3d 1052, 1120 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018) ("None of those defendants has a financial incentive to return to court. Only the bail funds lose money if the arrestee fails to appear. But the bail funds have consistently achieved [high] appearance rates."); *Schultz*, 330 F. Supp. at 1363 (Vast majority of criminal defendants "whose bail was paid by charitable organizations, i.e. who had no 'skin in the game,' made all court appearances."); *Dixon*, 2019 WL 2437026 at *15 n. 18 (noting high court appearance rates of participants in the St. Louis Bail Project, as well as the fact that approximately half of its participants' cases ended in dismissals).

[21] *See, e.g.*, William S. Paul, M.D., MPH, FACP, Director of Health, Nashville-Davidson Metro Public Health, *Response and Investigation of a Rash Outbreak at the CoreCivic Facility* (July 6, 2017), https://cutt.ly/we3WRb1 (documenting scabies outbreak at one of the jails where pretrial detainees are incarcerated in Davidson County).

plead guilty—regardless of actual guilt, or the availability of viable defenses—simply to end the ordeal of pretrial incarceration.[22] And the collateral consequences of conviction in areas such as housing, employment, and civic engagement are well documented.[23]

42. The NCBF exists to alleviate the harm caused by this two-tiered pretrial system, and to demonstrate the ineffectiveness of conditioning pre-trial release on the payment of money. Since its inception, the NCBF has paid money bail for over 1,000 persons in Davidson County's jails who could not have otherwise secured their release.

43. One of every two NCBF participants resolves her case without any criminal conviction. It is impossible to determine how many of those people would

---

[22] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 17–18 (Nov. 8, 2016), https://cutt.ly/ue3WIBu (finding that a person who is detained pretrial is 13% more likely to be convicted and 18% more likely to plead guilty than a person who is not detained); Stevenson, *Downstream Consequences*, *supra* note 7, 3–4 (finding misdemeanor arrestees are 25% more likely than similarly situated persons to plead guilty and 43% more likely to be sentenced to time in jail); Philips*, supra* note 7, 116.
[23] *See, e.g.,* Nat'l Inst. Of Justice, *Beyond the Sentence – Understanding Collateral Consequences* (Feb. 26, 2013), https://cutt.ly/1e3W0dE (discussing range of arenas affected by conviction from student loans, voting, housing, and employment); U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), https://cutt.ly/he3W9y2 (briefing providing overview of collateral consequences, including those that create barriers to housing and student financial aid, and finding that these barriers confer no benefit to—and in fact harm—community safety).

have been convicted if they had remained incarcerated, but evidence from other jurisdictions suggests many of them would have eventually pleaded guilty simply to end the ordeal of jail.[24]

44.     The garnishment scheme especially harms persons held in Davidson County jails on unaffordable money bail because it threatens to shut down the primary avenue available to them to exercise their fundamental interest in pretrial liberty. The over 1,000 people the NCBF has bailed out to date had no other means of release. Each day, hundreds more people are incarcerated in a Davidson County jail on bail amounts they cannot afford.

## E.     Rule 10(B) and Gentry's Garnishment Policy Harm the Nashville Community Bail Fund and the People it Serves

45.     Through Rule 10(B) and his garnishment policy, Defendant Gentry is inflicting permanent and ongoing financial losses on the NCBF. These losses will inevitably bankrupt the NCBF. When that happens, people confined in jail in Davidson County on unaffordable bail requirements of $5,000 or less will once again be left without assistance.

---

[24] *See* Stevenson *Downstream Consequences*, supra note 7; Philips, supra note 7 at 116 (Using thousands of data points, a researcher in New York City determined that the conviction rate in non-felony cases was approximately 50 percent for those who could gain release within a day of arrest, but 92 percent for those who could not get out of jail).

20

46.     Since the Criminal Court Judges' decision became final on September 30, 2019, it has become clear that the NCBF will face sustained and considerable financial losses as Gentry garnishes its bail deposits.

47.     Since then, the NCBF has paid bail for 106 people, totaling $155,000. As of today, Gentry has fully refunded 13 of those bail payments, totaling $22,750 because Rule 10(B) did not require garnishment.

48.     Of the 93 bail bonds posted since September 30, 2019 that are still on deposit with Gentry, 86 of those cases with bail totaling $121,650 remain pending in court and are subject to Rule 10(B) garnishment depending upon the case outcome. In the remaining 7 cases, the court has assessed fines, court costs, or restitution against the NCBF's participant; thus, the NCBF will lose $7,463.49[25] of the $10,600 on deposit for those cases upon requesting a refund.

49.     Gentry does not execute judgments on bail deposits until a request for refund is made and processed. To avoid permanent financial losses to its revolving Bail Fund pending the outcome of this litigation, the NCBF has not sought refunds in cases where it deposited money on or after September 30, 2019 and court debts

---

[25] Based on the amount of court debts assessed against NCBF participants thus far, the NCBF expects a substantial portion of each deposit to be garnished in cases subjected to Rule 10(B). For example, one participant has already had $500 of fees and taxes assessed in his case, and so a third of his $1,500 bail posted by the NCBF will be garnished upon return.

21

have been assessed against the participant. As a result, an increasing portion of NCBF funds remains on deposit with Gentry instead of returning to the NCBF's revolving fund. This increasingly limits the funds available to the NCBF to bail out persons who are trapped in jail due to unaffordable bail amounts.

50.     As of the filing of this complaint, the NCBF estimates it will lose at least $7,463.49 bail deposits it has paid since September 30, 2019 due to the garnishment policy. That is 70% of the total bail deposits in the closed cases where garnishment is expected.

51.     The NCBF predicts that it will lose approximately half of its bail deposits each month, which will eventually deplete its revolving fund. As such, Rule 10(B) and Gentry's garnishment policy threaten the NCBF's continued existence. To slow this inevitable result, in January 2020, the NCBF implemented a $20,000 monthly cap and previously imposed a $2,000 personal cap on the amount of bail deposits it will make. As a result of these caps, persons for whom the NCBF would have otherwise paid bail will remain in jail.

52.     Further, because the NCBF requires relief from Rule 10(B) and Gentry's garnishment policy to continue operating, it has had to expend, and will continue to expend, significant time and resources advocating against these policies.

53. For example, after the first *en banc* meeting, the NCBF prepared a detailed request to the Criminal Court Judges to refrain from rescinding its Rule 10(B) exemption. Its petition analyzed data from the Criminal Court Clerk's office and included affidavits prepared by NCBF Executive Director Tracey Shafroth, Davidson County Sheriff's Office Chief of Administration John Hudson, and Courts Director of State Trial Courts for the Criminal Court Clerk's office Nicholas A. Kiefer, all of which required significant effort by the NCBF.

54. The NCBF has also prepared and issued public statements about the harms caused under Rule 10(B). *See Statement on Local Rule*, Nashville Community Bail Fund, https://cutt.ly/Xe7PFqk.

55. Resources and time the NCBF once directed toward its core mission— posting cash bail for those unable to afford it themselves, and supporting those people upon release—it must now divert toward challenging the garnishment scheme.

**F.    There is no Legal Process To Challenge Rule 10(B) and Gentry's Garnishment Policy in State Court**

56. Local officials do not afford bail depositors any process in the Davidson County courts to prevent enforcement of Rule 10(B) or Gentry's garnishment policy. Nor is there any procedure to challenge the legality of this garnishment scheme when bail is set, when bail is paid, or when the case is resolved and bail is refunded.

23

57.     Beginning on September 30, 2019, NCBF representatives requested a pre-garnishment hearing in writing on the Clerk's Form approximately thirty times that they posted bail. Rather than providing any forum for a hearing, Gentry ignored these requests. Instead, his staff simply notified the NCBF that pursuant to Rule 10(B), he will automatically take any amount owed by an NCBF participant out of the cash bail deposit when a refund request is made and processed.

58.     When the Criminal Court Judges revoked the NCBF's exemption from Rule 10(B), they suggested that the NCBF—and presumably others paying cash bail—may obtain "relief" from garnishment on a case-by-case basis. Ex. D. This would require the NCBF or any other third-party surety to obtain an order from the sentencing court finding the arrestee indigent and waiving payment of any fine, court costs or restitution assessed. *See* Ex. D at 2–3. This "remedy" does not legitimize the garnishment scheme, nor does it afford the NCBF or any other third party a forum to assert *their own* rights. Further, the solution has proven impractical and insufficient.[26]

59.     For example, on October 2, 2019 an NCBF participant whose $1,500 bail was paid on September 30, 2019, resolved his case before General Sessions

---

[26] First, by design, NCBF participants lack the means to pay relatively low bail requirements. Further, tethering a requirement that a *third party* pay fines, fees, costs, and other debts to an underlying indigency determination regarding *the arrestee* is illogical: the arrestee would not be paying the money in any event.

Judge Allegra Walker. Judge Walker assessed fines and court costs exceeding the participant's underlying bail amount. NCBF Manager Rahim Buford was in court at the time, and requested an indigency hearing as the Criminal Court Judges suggested.

60.    Judge Walker evaluated the NCBF participant's indigence and waived his court costs. Judge Walker declined, however, to waive fines and taxes totaling $500 even after concluding that the participant is indigent.

61.    Gentry has notified the NCBF that pursuant to Rule 10(B), his office will automatically retain $500 of the $1,500 cash bail posted in this case when the NCBF seeks a refund. Despite the NCBF's request for a hearing on the Clerk's Form, Gentry has not provided an opportunity for the NCBF to be heard prior to garnishment.

## V.          CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Excessive Bail in Violation of the Eighth Amendment to the U.S. Constitution
42 U.S.C. § 1983**

62.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

25

63.     The Eighth Amendment prohibits exploiting cash bail as a means of exacting payment for fines and fees, even if debts are related to the criminal case in which bail is set.

64.     Further, under the Eighth Amendment, money bail may be set only in an amount reasonably necessary to assure the court appearance of the individual. Any pretrial restraint on liberty must be individually tailored to address a specific, compelling need. Money bail set beyond the amount reasonably necessary to promote court appearance, or for an impermissible purpose, is unconstitutionally excessive.

65.     Rule 10(B), and Gentry's enforcement of it, uses bail for an improper purpose: to generate revenue. Further, Gentry refuses to accept money bail and authorize the release of an individual incarcerated on a secured bond unless the person posting bond acknowledges in writing that bond will be garnished as payment for post-disposition fines, costs, and restitution.

66.     Through enforcement of Rule 10(B) and his own garnishment policy, Gentry violates the Eighth Amendment rights of all accused persons in the Nashville Criminal Courts.

67.     This practice injures the NCBF, which suffers financial losses and a diversion of its resources.

26

## SECOND CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment Doctrine of Unconstitutional Conditions
### 42 U.S.C. § 1983

68.     Plaintiff re-alleges and incorporates by reference each and every allegation above as if fully set forth herein.

69.     An arrested person has a constitutionally protected fundamental liberty interest in pretrial release; once a money bail condition has been set in an individual's case, she has a further liberty interest in satisfying it.

70.     Rule 10(B) and Gentry's garnishment policy exact a penalty on the exercise of this liberty interest by forcing individuals entitled to release to accept that the posted bail will be garnished for fines, costs, and restitution.

71.     The garnishment scheme is not narrowly tailored to promote a compelling government interest.

72.     This exaction thus has an impermissible chilling effect on the liberty interest of individuals being released from jail by posting bail.

73.     This exaction directly injures Plaintiff NCBF, which suffers financial losses and a diversion of other resources as a direct result of the unconstitutional conditions generated by Rule 10(B) and Gentry's garnishment policy.

27

## **THIRD CLAIM FOR RELIEF**

### **Violation of the Fourteenth Amendment Right to Due Process**
### **42 U.S.C. § 1983**

74.     Plaintiff re-alleges and incorporates by reference each and every allegation above as if fully set forth herein.

75.     Under the Due Process Clause of the Fourteenth Amendment, the government must provide notice and an opportunity to be heard prior to depriving individuals of their property.

76.     Third parties who pay a bail deposit retain their property interest in the deposit, because, under Tennessee law, a bail deposit does not convert into the arrestee's property upon posting.

77.     When Gentry garnishes cash bail deposits made by third parties, those third parties are not given notice or an opportunity to be heard by a neutral decisionmaker prior to garnishment.

78.     Through enforcement of Rule 10(B) and his garnishment policy, Gentry violates the due process rights of the NCBF, which in turn suffers financial losses.

### **VI.        REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court provide the following relief:

a.      Assume jurisdiction over this action;

28

b.      A declaration that Rule 10(B) and Gentry's garnishment policy violate the Eighth Amendment prohibition on excessive bail;

c.      A declaration that Rule 10(B) and Gentry's garnishment policy violate the Fourteenth Amendment right to due process by placing unnecessary conditions on the exercise of a protected liberty interest;

d.      A declaration that Rule 10(B) and Gentry's garnishment policy violate the Fourteenth Amendment right to due process;

e.      An order and judgment preliminarily and permanently enjoining Gentry from enforcing his policy of conditioning the posting of cash bond on future payment of criminal debts, including his use of a written form to extract a promise to pay such debts;

f.      An order and judgment preliminarily and permanently enjoining Gentry from enforcing Rule 10(B) by collecting criminal debts from cash bond deposits;

g.      Award Plaintiffs costs and reasonable attorney fees; and

h.      Order such other relief as the Court deems just and appropriate.

Dated: February 5, 2020

Respectfully submitted,

/s/ Thomas H. Castelli
Thomas H. Castelli BPR# 24849
*On behalf of Attorneys for Plaintiff*
ACLU Foundation of Tennessee, Inc.

P.O. Box 120160
Nashville, TN 37212
Telephone: (615) 320-7142
tcastelli@aclu-tn.org

Andrea Woods (lead counsel)*
Brandon J. Buskey*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Fl.
New York, NY 10004
Telephone: (212) 549-2528
awoods@aclu.org
bbuskey@aclu.org

Charles Gerstein
Civil Rights Corps
1601 Connecticut Ave NW
Suite 800
Telephone: (202) 894-6128
charlie@civilrightscorps.org

<u>/s/ C. Dawn Deaner</u>
C. Dawn Deaner
Choosing Justice Initiative
1623 Haynes Meade Circle
Nashville, TN 37207
Telephone: (615) 431-3746
dawndeaner@cjinashville.org

*  =  *pro  hac  vice  application
forthcoming*
*Attorneys for Plaintiff*

30