# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| The Nashville Community Bail Fund, | Case No. 3:20-cv-00103 |
| *Plaintiff*, | Judge Aleta A. Trauger |
| v. | |
| Hon. Howard Gentry, Criminal Court Clerk; *in his official capacity*; | |
| *Defendant.* | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff respectfully submits this memorandum of law in support of its Motion for a Preliminary Injunction. Plaintiff seeks an order enjoining Defendant Gentry from (1) enforcing Local Rule Governing Bail Bonds 10(B) and (2) requiring anyone posting a cash bond to sign a form agreeing to and acknowledging future garnishment prior to Gentry accepting the bond. As set forth in this memorandum, both actions violate the Eighth Amendment to the United States Constitution.

## I. PRELIMINARY STATEMENT

The Nashville Community Bail Fund was established to address a practice that significantly harms thousands of people each year: overreliance on secured money bail. In Davidson County, a person's ability to post secured bail dictates that

person's immediate freedom after arrest. Judicial officers routinely impose secured bond conditions, which result in detention for those who cannot afford to pay them.[1] The NCBF's mission is to level the playing field for those who cannot afford to purchase their release, and to reduce the considerable harms of pretrial detention.

Davidson County officials have promulgated unconstitutional policies that now threaten the NCBF's existence. Under Davidson County Local Rule Governing Bail Bonds 10(B), Defendant Criminal Court Clerk Howard Gentry garnishes cash bond deposits to collect judgment debts from court costs, fines, and restitution. Pursuant to policies created by his office, Gentry requires that people posting cash bonds acknowledge notice of and agree to prospective garnishment in writing. If a bail depositor does not provide this written agreement, Gentry does not accept their bond and the arrestee will remain incarcerated. The Supreme Court has squarely rejected such bail conversion practices as impermissibly "excessive" and therefore prohibited by the Eighth Amendment. *Cohen v. United States*, 82 S. Ct. 526, 528 (1962) (Douglas, J., in chambers).

For years, the Criminal Court Judges granted the NCBF an exemption from Rule 10(B) garnishment. As a result, the NCBF was able to secure the release of

---

[1] *See, e.g.*, Southerners on New Ground Nashville, *Courtwatch Mini Report*, (Dec. 2019), https://cutt.ly/BrqBY0K, attached as Ex. A to Woods Dec.

2

hundreds of people who otherwise would have remained detained due to a lack of resources. One of every two Bail Fund participants resolves their case with no conviction. It is impossible to determine how many of those people would have been convicted if they had remained incarcerated, though there is robust evidence that pretrial incarceration causes people to plead guilty.[2] Those freed by the NCBF were better able to contest the charges against them, and ultimately avoid conviction, fees, and related debts.

The Criminal Court Judges of Davidson County revoked the NCBF's exemption to bail garnishment on September 30, 2019. Shortly thereafter, Gentry began applying his policy of conditioning acceptance of money bonds on receiving written agreement to garnishment against the Bail Fund.

The NCBF's existence depends on a revolving fund that relies on recovering posted bond money at the conclusion of a participant's case.[3] Because the court may

---

[2] *See* Megan Stevenson, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 3–4 (July 2016), https://cutt.ly/Qe3WPjm (finding incarcerated misdemeanor arrestees are 25% more likely than similarly situated persons to plead guilty and 43% more likely to be sentenced to time in jail), attached as Ex. B to Woods Dec.; Mary T. Philips, Ph.D., New York Criminal Justice Agency, Inc., *A Decade of Bail Research in New York City*, 116 (Aug. 2012), https://cutt.ly/6e3WDrE ("The data suggest that detention itself creates enough pressure to increase guilty pleas without the need for the extra inducement of a reduced charge."), attached as Ex. C to Woods Dec.

[3] The Bail Fund refers to those individuals whose bail it pays as its "participants."

3

forfeit posted bonds for those who fail to appear, the NCBF stakes its survival on ensuring that participants return to court. By garnishing bail even for participants who return to court, Rule 10(B) and Gentry's policy will inevitably deplete the NCBF's revolving fund and bankrupt the organization. This imminent threat to the NCBF's operation also jeopardizes the right to pretrial release of individuals arrested in Davidson County for whom the NCBF would ordinarily post bail. These individuals will instead remain in jail and suffer the irreparable harms of pretrial incarceration.

Because cash bail garnishment threatens the NCBF's continued operation, the NCBF seeks a preliminary injunction halting Defendant Clerk Gentry from enforcing both the unconstitutional rule and his garnishment-form policy.

## II. STATEMENT OF FACTS

The facts necessary for this Court to conclude that Rule 10(B) and Gentry's garnishment policy violate the Eighth Amendment are clear: the written rule and Gentry's form are unequivocal (*See* Davidson County Local Rules Governing Bail Bonds, Exhibit A to Dec. of Rahim Buford; Sample Clerk's form, Exhibit B to Buford Dec.); the NCBF is indisputably now subject to both (*see* Preliminary Rule 10(B) Policy Order, Ex. C to Buford Dec; Final Rule 10(B) Policy Order, Ex. D to Buford Dec; Buford Declaration at ¶¶ 20–21); and the amount of money the NCBF stands to lose as a result is large enough to threaten its continued operation (Buford

4

Dec. at ¶¶ 28–39; NCBF 2020 Projected Losses, Ex. I to Buford Dec.). Although other facts, described below, may be relevant to this Court's consideration of the equities of a preliminary injunction, these essential facts are all that is required to establish the merits of Plaintiff's constitutional claims.

### A. The NCBF Addresses a Serious Need in the Nashville Community

Since its inception in 2016, the NCBF has provided vital support to persons arrested in Davidson County who cannot afford cash bail. In total, the NCBF has posted bail for 1,004 people, posting a total of $2,314,900 in cash bail. Buford Dec. at ¶ 10. In 2019, the NCBF posted 445 cash bail deposits, approximately 37 per month, with an average money bail amount of $1,800.13. *Id.* at ¶ 13. Through the NCBF's operation, these hundreds of individuals were saved thousands of additional days in jail and their families were spared further hardship.

These include people like Rebecca Gill, who was incarcerated on a $2,500 bail requirement she could not afford after the police responded to a fight she had with her sister. Buford Dec. at ¶ 11. Unsure when she would see a judge and unable to post her bail even after asking friends for help, Ms. Gill was in danger of losing her job and her driver's license. *Id.* Each day of incarceration added to those pressures. *Id.* Despite her presumed innocence, and valid legal defenses including self-defense, Ms. Gill felt enormous pressure to plead guilty in order to get out of jail and maintain her work and family responsibilities. *Id.* The NCBF posted Ms.

5

Gill's bail, and she returned to her work, maintained her license, and went home to her teenaged son. *Id.* at ¶ 12. The assault charge against Ms. Gill was ultimately retired.

The Bail Fund alleviates not only the human cost of pretrial detention, but it also improves system outcomes. Davidson County realizes considerable savings from the Bail Fund's efforts: it costs $103 per day to detain someone in jail prior to trial. *See* Affidavit of John Hudson, Ex. G to Buford Dec. at 50. NCBF participants have a high overall success rate, as 80% or more remain in good standing throughout the duration of their case. Buford Dec. at ¶ 14. And people who are at liberty during their criminal prosecution are less likely to be pressured into pleading guilty and facing the collateral downstream consequences: half[4] of people freed with assistance from the NCBF concluded their case without a conviction.

The NCBF's work illustrates the flaws in Davidson County's overreliance on money bail. By posting cash bail on behalf of persons who cannot afford it, the NCBF reduces the significant consequences of pretrial detention—for example, the loss of jobs or housing, exposure to unsanitary or dangerous conditions in jail, inability to provide for family members, and difficulty defending oneself—and

---

[4] Of 792 total participants whose cases have completely closed, 394 had a dismissal, no true bill, nolle prosequi, not guilty verdict, retirement, or the State was unable to prosecute. Buford Dec. at ¶ 14.

6

promotes individual and family stability. Further, the NCBF supports participants

upon release and provides them with court date reminders.[5]

### B. Rule 10(B) and Gentry's Garnishment Policy Jeopardize the NCBF's Continued Operation, Risking Further Harm to Arrestees in Davidson County

Davidson County Local Rule Governing Bail Bonds 10(B), promulgated by

the Criminal Court Judges, provides:

> Any individual who desires to deposit a cash bond with the Clerk
> pursuant to TCA § 41-11-118 shall be notified in writing by the Clerk
> that such cash deposit shall be returned subject to any fines, court
> costs, or restitution as ordered by the Court. No cash bond may be
> received in the amount of $10,000.00 or more without notice to the
> District Attorney General and a hearing in open court pursuant to
> TCA § 3-9-11-715.

*See* Local Rules Governing Bail Bonds, Ex. A to Buford Dec.

When people go to the Clerk of Court's office to post a cash bond, they

receive a form, created by Gentry, that quotes the text of Rule 10(B) and further

states, in relevant part:

> I . . . understand this cash bond is subject to execution for satisfaction
> of all fines, fees, court costs, taxes and restitution assessed against the

---

[5] *See* Buford Dec. at ¶ 8. Such reminders have proven to be a more effective and
fairer means of promoting court appearance than secured bail requirements. *See*
Nat'l Inst. Corr., *A Framework for Pretrial Justice: The Essential Elements of an
Effective Pretrial Services System and Agency*, 47 (Feb. 2017),
https://cutt.ly/ke6QJzk (noting court date reminders are "highly effective" and
citing reports from eight jurisdictions to adopt the practice), attached as Ex. D to
Woods Dec.

7

defendant in ALL matters related to this warrant/case number(s), probation violation or other post judgment issue. I further understand the person tendering the cash bond is due the refund, upon request, once all fines, fees, court costs, taxes, and restitution are satisfied . . .

*See* Clerk's Form, Ex. B to Buford Dec. Gentry will not accept payment of bond unless the individual posting bond signs this form. Without a signature, Gentry refuses to release the arrestee, who must then remain in jail.

Thus, Gentry conditions the payment of pretrial money bail on the future use of that money to pay fines, fees, costs, taxes, and restitution. This garnishment occurs regardless of whether bond is paid by the individual arrestee or a third party. Further, Gentry garnishes cash bail when a person successfully makes their court appearances. Requiring third parties to submit deposited funds to garnishment to pay other people's debts is entirely unrelated to any compelling interest the Constitution recognizes for conditions of pretrial release. *Cohen*, 82 S. Ct. at 528.

In September 2019, pursuant to a policy of the criminal court,[6] Gentry began subjecting the NCBF to Rule 10(B) and his additional policy. Under that policy, after

---

[6] Before September 2019, the NCBF was exempt from Rule 10(B), allowing the Bail Fund to operate under its revolving fund model. However, the Davidson County Criminal Court Judges revoked this exemption on September 30, 2019, ostensibly due to concerns that too many NCBF participants' cases were in conditional forfeiture status. There is no plausible explanation—and the judges have not offered any—for how garnishing bonds posted by the NCBF would lower the risks of flight and forfeiture rates on the part of NCBF clients. And assuring

8

a criminal case is concluded by conviction or any other assessment of costs,[7] Gentry collects criminal-system debts from the bonds deposited on an arrestee's behalf only when the depositors request that the money be refunded. Because the NCBF seeks a ruling from this Court that Rule 10(B) and Gentry's policies are unconstitutional, it has not requested refunds of its deposits in cases that end in money judgments. For the time being, the NCBF has been able to continue operating, albeit in a limited capacity. But soon the NCBF will lose a substantial portion—and eventually the entirety—of its revolving fund and will be forced to shut down.

There is no forum for individuals or the NCBF to challenge the legality of Rule 10(B) and Gentry's garnishment policy during the pendency of the arrestee's criminal case. *See* Buford Dec. at ¶¶ 23–26. And, although an individual may appeal a judgment against her after conviction, there is no forum in which the NCBF can resist the garnishment of its deposited funds to satisfy a criminal judgment entered against one of its participants.

_____

court appearance is the only lawful purpose for imposing financial conditions on pretrial release.

[7] In some instances, the court may accept an agreed resolution of dismissal of a criminal case with payment of costs.

9

The Bail Fund currently has $445,900 on deposit with the Criminal Court Clerk's office, reflecting 217 individual cases.[8] Buford Dec. at ¶ 13 Of this, $132,250 from 93 cases are deposits made after the Bail Fund became subject to garnishment; these amounts are thus susceptible to being lost were the NCBF to request a refund. Buford Dec. at ¶ 33. Because approximately half of the Bail Fund's cases end in conviction, the NCBF expects its projected losses to increase rapidly. *See* Projected Losses, Ex. I to Buford Dec.

The Bail Fund has downsized its operations in two ways in light of its projected losses: (1) first, it has imposed a $20,000 monthly cap on total amount of cash it will deposit in bail, *see* Buford Dec. at ¶ 29, and (2) second, it has imposed a $2,000 personal cap—a reduction of its prior $5,000 cap—on the amount of bail it will post for any given individual, *id.* at ¶ 30. In January 2020, the NCBF posted 17 bail deposits totaling $21,050. *Id.* at ¶ 29. By comparison, the NCBF posted 36 bail deposits totaling $70,700 in January 2019. *Id.* Were it not for Rule 10(B) and Gentry's garnishment policy, a number of people who remained in jail would have been freed with the NCBF's assistance. *Id.* at ¶ 31.

---

[8] Bail deposits may be on hold with the Clerk's office for a number of reasons, most notably that the individual's criminal case is still pending.

10

Finally, the Bail Fund has devoted time and resources challenging Rule 10(B) and Gentry's garnishment policy. In May, the NCBF prepared numerous documents for the Criminal Court Judges—who promulgated Rule 10(B) and who ended the NCBF's long-standing exemption—requesting to retain their exemption to garnishment. *See* Petition to Amend May 6 Order, Ex. E to Buford Dec.; Memo in Support of Petition to Amend May 6 Order, Ex. F to Buford Dec.; Exhibits to Petition to Amend May 6 Order, Ex. G to Buford Dec. The Bail Fund has prepared and issued a public statement about the harms Rule 10(B) poses to its operation. Nashville Community Bail Fund, *Statement on Local Rule*, https://cutt.ly/Se6EsWQ and attached Ex. H to Buford Dec.

Further, beginning on September 30, 2019, NCBF staff requested an opportunity to be heard prior to Gentry garnishing court debts from bonds in approximately thirty of their cases. *See*, *e.g.*, Clerk's Form, Z. Garcia case, Ex. B to Buford Dec.; Buford Dec. at ¶ 23. The Bail Fund, however, does not receive notice or a forum to be heard at any point prior to case disposition or garnishment. Buford Dec. at ¶¶ 23–26. This poses an additional burden on the Bail Fund to determine when one of its participants may have fines, fees, costs, taxes, or restitution assessed against them and to make an appearance if possible. *Id.* ¶ 35.

## III. ARGUMENT

### A. Standard of Review

11

Courts consider four factors in deciding whether to issue a preliminary injunction: whether (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable harm without the injunction; (3) issuance of the injunction would cause substantial harms to others; and (4) the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Although the irreparable harm requirement is a necessary prerequisite, the Court must weigh "the strength of the four factors against one another[.]" *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992)).

## B. Plaintiff Has a Strong Likelihood of Success on the Merits of Its Eighth Amendment Claim

The bail garnishment policies violate the Eighth Amendment's prohibition on excessive bail. Any pretrial restraint on liberty must be individually tailored to address a specific, compelling need. *United States v. Salerno*, 481 U.S. 739, 754 (1987) ("[C]onditions of release or detention [may] not be excessive in light of the perceived evil."). Bail conditions that are not tailored to the purpose of reasonably assuring an individual's court appearance are "excessive" under the Eighth Amendment. *Stack v. Boyle*, 342 U.S. 1, 5 (1951).

12

The primary function of money bail is to reasonably assure the court that the arrestee will appear at future court proceedings[9] by incentivizing her to return to future court dates while her criminal case is pending.[10] By returning to court as required, even an arrestee who ultimately faces conviction receives her bail money back.[11] But Gentry's practices under Rule 10(B) and his office's form undermine the

---

[9] *See, e.g., Stack v. Boyle*, 342 U.S. 1, 5 (1951); *Bandy v. United States*, 82 S. Ct. 11, 12 (1961) (Douglas, J., in chambers) ("The purpose of bail is to insure the defendant's appearance and submission to the judgment of the court."); *Fields v. Henry Cty., Tenn.*, 701 F.3d 180, 184 (6th Cir. 2012) (relevant Eighth Amendment inquiry is whether bail conditions are "aimed at assuring the presence of a defendant"); *United States v. Beaman*, 631 F.2d 85, 86 (6th Cir. 1980) ("The test for excessiveness is . . .whether the amount of bail is reasonably calculated to assure the defendant's appearance at trial"); *Hill v. Hall*, No. 3:19-cv-00452, 2019 WL 4928915 at *11 (M.D. Tenn. Oct. 7, 2019) (noting the purpose of bail is "to assure the defendant's appearance at trial or hearing"); *State v. Burgins*, 464 S.W.3d 298, 303 (Tenn. 2015) (the purpose of bail is assuring the defendant's appearance at trial); *Wallace v. State*, 245 S.W.2d 192, 194 (Tenn. 1952) (the primary purpose of bail is "to relieve the accused of imprisonment . . . and to secure the appearance of the accused"); *see also United States v. Salerno*, 481 U.S. 739, 752 (1987) (holding that protection of public safety, in addition to assuring defendant's presence in court, reflects an additional permissible purpose for court to consider when evaluating the need for pretrial detention, though not discussing money bail as a condition of release).

[10] *See, e.g.*, Harvard Law School Criminal Justice Policy Program, *Moving Beyond Money: A Primer on Bail Reform*, 8 (Oct. 2016) (discussing theory that bail bonds incentivize future court appearance), attached as Ex. E to Woods Dec.

[11] The efficacy of money bail to function as an incentive for court appearance has been cast into doubt by empirical studies. Recent evidence suggests there are significant limitations to the efficacy of secured bail bonds to promote court appearance, *see* Michael Jones, Ph.D., *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pretrial Justice Institute (Oct. 2013), https://cutt.ly/Se3WGqK (controlling for risk level and finding that persons

13

permissible terms of the bail agreement by *reducing* the amount of collateral a given arrestee could expect upon appearing in court.

1.    <u>*Cohen* and its Progeny Establish that Bail Cannot be Conditioned on the Future Payment of Court Debts</u>

Nearly sixty years ago, the United States Supreme Court ruled that the Excessive Bail Clause prevents courts from using bail as a means to pay court fines. *Cohen* 82 S. Ct. at 528.[12] In *Cohen*, Justice Douglas held that conditioning a bail bond on a requirement of payment for a fine rendered the bail unconstitutionally excessive. *Id.* at 528 (adopting the reasoning of *Cain v. United States*, 148 F.2d 182

─────────────────────

released on unsecured bonds performed as well as those released on secured bonds in terms of court appearance rates), attached as Ex. F to Woods Dec.; Brooker, Claire M. B., et al*., The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds* (June 2014) (finding the same in another jurisdiction), attached as Ex. G to Woods Dec.; *see also* Claire M.B. Brooker, *Yakima County, Washington Pretrial Justice System Improvements: Pre- and Post-Implementation Analysis*, Pretrial Justice Institute, 6 (Nov. 2017), https://cutt.ly/3e3YW8M (observing similar rates of court appearance, but increased release, after reforms implemented that utilized unsecured bonds more frequently). Further, less restrictive interventions—such as court date reminders and unsecured bonds—are available and at least as effective. *See, e.g.*, Essential Elements of an Effective Pretrial System, *supra* note 5 at 47, https://cutt.ly/crcyQkL (discussing success of numerous court reminder programs across the country). Plaintiff, however, does not argue here that secured money bonds are unconstitutional on their face.

[12] Prior to *Cohen*, the Ninth Circuit issued two decisions reaching the same conclusion. *See Connley v. United States*, 41 F.2d 49, 51 (9th Cir. 1930) (finding a requirement that a bail bond operate as a supersedeas to payment of a fine rendered bail excessive); *Cain v. United States*, 148 F.2d 182, 183 (9th Cir. 1945) (same).

14

(9th Cir. 1945)). "The imposition of an additional burden" on a bail payment—namely, an assurance of payment of fines and fees—would "frustrate the purposes for which bail was historically intended." *Id.* Recognizing that bail bonds are meant to promote the likelihood "that the accused will reappear at a given time by requiring another to assume personal responsibility for him," *Cohen* rejected a requirement that bail money be used to guarantee a payment of debts, even those assessed in the underlying criminal case. *Id.* (citing 4 Blackstone, Commentaries 380 (Hammond ed. 1890)).

Lower courts have affirmed that conditioning bail deposits on their use to pay fines or fees violates the Eighth Amendment. "The purpose of bail is to secure the presence of the defendant . . . not to enrich the government or punish the defendant." *United States v. Rose*, 791 F.2d 1477, 1480 (11th Cir. 1986); *United States v. Powell*, 639 F.2d 224, 225 (5th Cir. 1981); *see also United States v. Higgins*, 987 F.2d 543, 547 (8th Cir. 1993) (acknowledging purpose of any precondition on bail is to "secure the presence of the defendant"); *United States v. Cannistraro*, 871 F.2d 1210, 1213 (3rd Cir. 1989) (accepting principle regarding purpose of bail articulated in *Rose* but distinguishing facts).

For example, in *Rose*, the Eleventh Circuit struck down a precondition that bond money be used towards payment of any subsequent court fines on Eighth Amendment grounds. 791 F.2d at 1480. As a condition of his bond, Joseph Rose was

15

required to "abide the final judgment and pay the fine imposed upon affirmance of the sentence of the appellate court." *Id.* at 1479. The Eleventh Circuit found that the requirement that the bond be used to pay subsequent court fines reflected a purpose "other than that for which bail is required to be given under the Eighth Amendment" and was therefore "excessive." *Id.* at 1480. Of particular relevance in this case, the *Rose* Court stated:

> We have no doubt that the addition of any condition to an appearance bond to the effect that it shall be retained by the clerk to pay any fine that may subsequently be levied against the defendant after the criminal trial is over is . . . "excessive" and is in violation of the Constitution.

791 F.2d at 1480; *see also State ex rel. Baker v. Troutman*, 553 N.E.2d 1053, 1056 (Ohio 1990) (striking down a condition that individuals posting bail "consent to forfeit the bail for fines and costs," as excessive under the Ohio constitution's companion excessive bail clause).[13] And the Fifth and Eleventh Circuits have both

_____

[13] *See also United States v. Powell*, 639 F.2d 224, 225 (5th Cir. 1981) (rejecting government's application to use bail monies to pay fines and fees on basis of federal statute and federal rules, noting: "[t]he purpose of bail is to secure the presence of the defendant, its object is not to enrich the government or punish the defendant[.]") (citing *Smith v. United States*, 357 F.2d 486 (5th Cir. 1966); *United States v. Parr*, 594 F.2d 440 (5th Cir. 1979)); *United States v. Jones*, 607 F.2d 687, 688 (5th Cir. 1979) ("The United States as creditor is not in possession of the debtor's money. The clerk of court holds the cash bail under the terms of a specific agreement.").

16

concluded that ensuring payment of administrative fees is not a compelling government interest appropriately served by pretrial conditions.[14]

In *United States v. Cannistraro*, the Third Circuit rejected an Eighth Amendment challenge to a lien placed on a criminal defendant's bail money by explicitly distinguishing the facts before it from those at issue in *Cohen*, *Rose*, and presented by Rule 10(B) and Gentry's form. 871 F.2d 1210, 1213 (3rd Cir. 1989). While in *Rose* the arrestee's bond form contained language requiring him to "abide the final judgment and pay the fine imposed upon affirmance of the sentence of the appellate court," Richard Cannistraro was not required to agree as a condition of his bond to "pay any fine or make restitution." *Id.* And the Third Circuit noted that its ruling finding no Eighth Amendment violation would come out differently if the money at issue had been posted not by the defendant, but by a third party. *Id.*

Rule 10(B) violates these principles: it outright conditions bail on the future use of cash bail deposits to pay fines, costs, restitution, or litigation taxes. Gentry's form further requires depositors to agree in writing that their money will be subject

---

[14] *Campbell v. Johnson*, 586 F.3d 835, 843 (11th Cir. 2009) (finding excessive under the Eighth Amendment an administrative condition of bail that served to prevent release from jail); *Broussard v. Parish of Orleans*, 318 F.3d 644, 647–48, 651 (5th Cir. 2003) (noting the same principle, but concluding that challenged fifteen-dollar fee was not excessive absent evidence that the fee had ever prevented an arrestee from being released).

17

to garnishment in the future. This mirrors the unconstitutional practices presented in *Cohen*, *Rose*, and *Troutman* that were explicitly distinguished in *Cannistraro*.

2.      Rule 10(B) and Gentry's Garnishment Policy Are Not Tailored to Meet a Compelling Government Interest

Nor is Rule 10(B) tailored to meet a compelling government interest as required by *Salerno*, 481 U.S. at 754, and *Stack*, 342 U.S. at 5. Its only function is to generate revenue. But revenue generation—no matter how important to government coffers—is not a compelling government interest. *See Mayer v. City of Chicago*, 404 U.S. 189, 197 (1971) (declaring the government's fiscal interest "irrelevant" as compared to fair treatment of low-income people). Indeed, the State of Tennessee has already rejected revenue generation as a valid purpose of pretrial bail. *Wallace v. State*, 193 Tenn. 182, 187 (Tenn. 1952) (the "primary purpose of bail in a criminal case *is not to increase the revenue of the state* . . .") (emphasis added); *see also Campbell v. Johnson*, 586 F.3d 835, 843 ("[I]t is questionable whether a county's pecuniary interests can rise to the level of a compelling interest . . . ."); *Broussard*, 318 F.3d at 651 n.31 (The "perceived evil" of a "lack of funding for the bail-bond system . . . does not amount to the compelling interest the government has in preventing flight[.]").

The Criminal Court Judges have offered no explanation as to how subjecting cash bond deposits to garnishment promotes the accepted compelling interest of

18

promoting future court appearance.[15] Nor did they or Gentry ever claim that court appearance rates were negatively affected during the three years that the NCBF was exempt from Rule 10(B) and Gentry's form.

Imposing a garnishment requirement does nothing to promote court appearance. Plaintiff is likely to succeed on its claim that Rule 10(B) and Gentry's policy violates the Eighth Amendment prohibition against "excessive bail."

### C. Without an Injunction, Plaintiff and Arrestees in Davidson County Will Suffer Irreparable Harm

The harm the NCBF faces absent injunctive relief is plain and irreparable: the Bail Fund stands to lose the entirety of its revolving fund, and it may be forced to completely cease operation. Such harm is inevitable without the Court's intervention: each month the NCBF expects to lose approximately $10,000 to unconstitutional garnishment under Rule 10(B). Ex. I to Buford Dec. Further, the

---

[15] To the contrary, it is likely that Rule 10(B) interferes with court appearance rates by delaying release. Even very short periods of incarceration—a natural result of Rule 10(B) and Gentry's barrier to posting bond—yield worse court appearance rates upon release. *See, e.g.*, Christopher T. Lowenkamp et al., Laura and John Arnold Foundation, *The Hidden Costs of Pretrial Detention*, 4 (2013), https://cutt.ly/4e3YVvR (concluding that even forty-eight hours of pretrial detention is associated with increased likelihood of failure to appear pending trial), attached as Ex. I to Woods Dec. And Defendant's policy reduces whatever limited incentives for court appearance exist to retain a secured bail deposit: even perfect court attendance will not ward off the garnishment of an individual's or third party's money.

19

NCBF has already reduced operations in response to the garnishment policies: people are thus remaining in jail whose bond would otherwise have been posted by the Bail Fund. Buford Dec. at ¶ 31. This interferes with the Bail Fund's mission and broader goals of public education. Because the Bail Fund's revolving model depends on a return of funds to continue operation, the harms of its financial losses will in turn seriously harm hundreds more people consequently subjected to pretrial detention on financial conditions of release they cannot afford.

Reduced operations and eventual termination will force the NCBF to abandon its mission to reduce harm and promote equality in Davidson County's pretrial system. As a result, hundreds of people would be left unable to secure their pretrial freedom. This loss of liberty will irreparably harm arrestees in Davidson County, who will once again face significant barriers to defending themselves against prosecution and maintaining personal and family stability. *See Cain,* 686 F.2d at 385 ("[I]ncarceration, quite obviously, disrupt[s] … family life, isolate[s individuals] from [their] friends, and destroy[s one's] ability to continue to work," which, in addition to the "harsh . . . atmosphere of jail[,] undoubtedly inflict[s] a grave hardship[.]").

### D. The Threatened Injury to Plaintiff Outweighs Any Harm an Injunction May Cause

Weighed against the considerable harms to the NCBF, any harm Defendant will experience under a preliminary injunction is minimal.

As discussed above, the government's interest in revenue generation is not compelling, particularly compared to the individual fundamental rights enshrined in the constitution. *See Mayer*, 404 U.S. at 197; *Wallace*, 193 Tenn. at 187; *Campbell*, 586 F.3d at 843; *Broussard*, 318 F.3d at 651. Further, whatever value Defendant derives from fines, fees, taxes, and restitution currently paid from cash bond deposits could be generated by following other existing processes, such as bail forfeiture hearings in cases[16] involving a failure to appear,[17] and post-conviction payment plans in cases involving a judgment. The harms the NCBF and its participants will suffer absent an injunction greatly exceed the harm of Gentry being required to collect criminal debts through other means.

Moreover, Davidson County may ultimately lose money absent an injunction, because incarceration costs will increase if the NCBF cannot continue to pay cash

---

[16] Under Tennessee law, forfeiture may be triggered when the arrestee "does not comply with the conditions of the bail bond" in cases where bail is posted via surety or bail bonds agent, *see* Tenn. Code Ann. §§ 40-11-139, 40-11-122 as well as after a failure to appear in cases where bail is posted as a cash bond, *see* Tenn. Code Ann.§ 40-11-201.

[17] Plaintiff does not dispute that in cases where a bail deposit is forfeited after sufficient process the government may opt to apply the forfeited funds against any outstanding criminal court debts.

21

bail for hundreds of people each year. These costs—estimated at $103 per person per day—could easily swallow any financial benefits achieved by Rule 10(B) and Gentry's enforcement of it.[18]

An injunction will not interfere with the efficiency of Davidson County's pretrial justice system. Rule 10(B) and Gentry's policy likely undermine, rather than promote court appearance, because these practices obstruct pretrial release and provide no additional incentive to return to court.[19]

Finally, an injunction would not pose any additional administrative burden on Defendant. The injunction Plaintiff seeks would simply halt Gentry's use of his current notice forms, *see* Ex. B to Buford Dec., and halt the subtraction of fines, fees, taxes, costs, and restitution from refunds of cash bail deposits.

### E. An Injunction Would Serve the Public Interest

An injunction is in the public interest. A preliminary injunction will ensure the NCBF is able to continue to serve its role of supporting those unable to pay bail amounts of $5,000 or less in Davidson County and resume its full functionality. This, in turn, promotes a number of goals squarely in the public interest: the reduction of individual and systemic harms, increased court appearance, and lower incarcerations

---

[18] *See* Hudson Affidavit at 50, Ex. G to Buford Dec.
[19] *See supra* note 15.

22

costs. Further, preventing Gentry from exacting any further infringement of the Eighth Amendment through Rule 10(B) and his office's garnishment policy is in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)).

## IV.   BRIEFING SCHEDULE

Plaintiff does not request an evidentiary hearing on its motion for a preliminary injunction: and one is not necessary. The Court may evaluate the NCBF's Eighth Amendment claim based solely on documentary evidence not subject to reasonable dispute. *See* Part II, *supra*. And Plaintiff has attached to this motion evidence regarding the immediate and pressing harms it is experiencing under Rule 10(B) and Gentry's garnishment policy. *See*, *e.g.*, Buford Dec., Ex. I to Buford Dec. If the Court is nonetheless inclined to hold a hearing, Plaintiff requests that it be conducted on an expedited schedule in light of the significant and irreparable injury Plaintiff faces—both financially and operationally—while awaiting injunctive relief.

Pursuant to Local Rule 7.01(a)(3), Defendant is due to respond to this motion within fourteen days.

## V. CONCLUSION

The NCBF satisfies the four factors for a preliminary injunction requiring Gentry to cease enforcement of Local Rule 10(B) and his policy of withholding acceptance of bond without written agreement to garnishment. Plaintiff is likely to succeed on the merits of its claim that Rule 10(B) and Gentry's garnishment policy violate the Eighth Amendment's Excessive Bail Clause. Further, the Bail Fund will suffer irreparable harm without an injunction, as it will be forced to continue to reduce, and ultimately to close its operation as its revolving fund continues to be depleted through garnishment. The balance of hardships favors the NCBF, and an injunction is in the public interest. Plaintiff respectfully requests the Court grant its motion and enter the proposed injunction.

Dated this 5th date of February 2020.

Respectfully submitted,

/s/ Thomas H. Castelli
Thomas H. Castelli (BPR# 24849)
*On behalf of attorneys for Plaintiff*

ACLU Foundation of Tennessee, Inc.
P.O. Box 120160
Nashville, TN 37212
Telephone: (615) 320-7142
tcastelli@aclu-tn.org

Andrea Woods (lead counsel)*
Brandon J. Buskey*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Fl.

24

New York, NY 10004
Telephone: (212) 549-2528
awoods@aclu.org
bbuskey@aclu.org

Charles Gerstein
Civil Rights Corps
1601 Connecticut Ave NW
Suite 800
Telephone: (202) 894-6128
charlie@civilrightscorps.org

/s/ C. Dawn Deaner
C. Dawn Deaner
Choosing Justice Initiative
1623 Haynes Meade Circle
Nashville, TN 37207
Telephone: (615) 431-3746
dawndeaner@cjinashville.org

*\= pro hac vice application forthcoming*

## Certificate of Service

I hereby certify that a true and exact copy of the foregoing *Memorandum in Support Of Plaintiff's Motion For A Preliminary Injunction* will be served on counsel for Howard Gentry identified below contemporaneously with the Summons and Complaint via hand delivery on the 6th day of February 2020:

> Hon. Howard Gentry, Criminal Court Clerk
> c/o Bob Cooper, Director
> Metro-Nashville Government Department of Law
> Metro Courthouse, Suite 108
> P.O. Box 196300
> Nashville, TN 37219-6300

*/s/*Thomas H. Castelli
Thomas H. Castelli