# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| THE NASHVILLE COMMUNITY BAIL FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:20-cv-00103** |
| | ) | **Judge Aleta A. Trauger** |
| HON. HOWARD GENTRY, Criminal Court Clerk, in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The Nashville Community Bail Fund ("NCBF") has filed a Motion for Preliminary Injunction (Docket No. 3), to which Howard Gentry, in his official capacity as Criminal Court Clerk for the Twentieth Judicial District, has filed a Response (Docket No. 15), and NCBF has filed a Reply (Docket No. 16). Gentry has filed a Motion to Dismiss (Docket No. 17), to which NCBF has filed a Response (Docket No. 19), and Gentry has filed a Reply (Docket No. 20). For the reasons set out herein, NCBF's motion will be granted in part and denied in part and Gentry's motion will be denied.

## I. BACKGROUND

### A. Structure of Pretrial Release and Bail in Tennessee

**1. State and Federal Requirements.** The State of Tennessee, like the federal government and the governments of its sister states, routinely jails individuals who have been charged with, but not convicted of, crimes, pursuant to a common practice known as "pretrial detention." As the state's Supreme Court has observed, the constitutional permissibility of pretrial detention, as a general matter, is widely accepted, and the practice itself dates back to

before this nation's founding, having been a feature of the pre-constitutional English courts from which early U.S. courts borrowed many of their organizing principles. *State v. Burgins*, 464 S.W.3d 298, 303 (Tenn. 2015). Also dating back to these pre-constitutional courts and surviving into the American experience, however, is the admonition that the government's right to pretrial detention is not absolute. *Id.* For example, under the Eighth Amendment of the U.S. Constitution, the government can deny a defendant pretrial release based on his failure to pay a bail—that is, a surety tied to his future return to court—but only if the bail amount is not "excessive"— "excessive" meaning, in this context, "[b]ail set at a figure higher than an amount reasonably calculated to" provide "adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack v. Boyle*, 342 U.S. 1, 5 (1951). The U.S. Constitution also forbids a court from continuing pretrial detention unless certain adequate procedures are observed. *See Schall v. Martin*, 467 U.S. 253, 263 (1984).

Although the U.S. Constitution imposes certain procedural requirements and substantive limitations on the pretrial detention process, it does not guarantee that a defendant be given a path to obtaining pretrial release in the first place. When a person is charged with a Tennessee state crime, however, the U.S. Constitution is not the only constitution that matters. The Tennessee Constitution, unlike its federal counterpart, requires that "all prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or the presumption great." Tenn. Const. art. 1, § 15. "This constitutional provision grants a defendant the right to pretrial release on bail pending adjudication of criminal charges." *Burgins*, 464 S.W.3d at 304 (citing *Swain v. State*, 527 S.W.2d 119, 120 (Tenn. 1975)). Although this right may be forfeited by a defendant's conduct, every non-capital defendant that enters the Tennessee

criminal justice system at least begins with a right to establish some conditions pursuant to which he can obtain his freedom until he is, if ever, convicted.[1] *See id.* at 306.

Because the federal Constitution only permits the amount of bail necessary to ensure the defendant's future appearance in court, Tennessee courts are required to undertake a process to determine how much, if any, bail is actually justified by the defendant's particular circumstances. First, the court must consider, based on a number of statutorily dictated factors, whether to release a bailable defendant on the defendant's own recognizance or an unsecured bond. Tenn. Code Ann. § 40-11-115(b); *Graham v. Gen. Sessions Court*, 157 S.W.3d 790, 793 (Tenn. Ct. App. 2004). If the statutory factors do not support release on the defendant's own recognizance or on an unsecured bond, the court is then to consider imposing conditions of release, including non-monetary conditions that would help ensure the defendant's appearance to stand trial. The court must "impose the least onerous conditions reasonably likely to assure the defendant's appearance in court." Tenn. Code Ann. § 40-11-116(a).

The conditions that may be imposed include:

(1) [r]eleas[ing] the defendant into the care of some qualified person or organization responsible for supervising the defendant and assisting the defendant in appearing in court . . . ;

(2) [i]mpos[ing] reasonable restrictions on the activities, movements, associations and residences of the defendant; and/or

(3) [i]mpos[ing] any other reasonable restriction designed to assure the defendant's appearance, including, but not limited to, the deposit of bail pursuant to § 40-11-117.

Tenn. Code Ann. § 40-11-116(b). Only if the court determines that "conditions on a release on recognizance" have not been shown to reasonably assure the defendant's appearance, may the

---

[1] Tennessee's pretrial detention statutes likewise provide that, "[w]hen [a] defendant has been arrested . . . for any bailable offense, the defendant is entitled to be admitted to bail by the committing magistrate, by any judge of the circuit or criminal court, or by the clerk of any circuit or criminal court . . . ." Tenn. Code Ann. § 40-11-105(a).

court, "in lieu of the conditions of release set out in § 40-11-115 or § 40-11-116, require bail to be given." Tenn. Code Ann. § 40-11-117. *See Graham*, 157 S.W.3d at 793 ("If it is not shown that conditions on a release on recognizance will reasonably assure the defendant's appearance as required, the magistrate shall require that bail be given in lieu of conditions of release.").

If the court determines that it will set monetary bail, it must then determine the amount to be required, based on a number of statutory factors listed in Tenn. Code Ann. § 40-11-118. Tennessee has set some statutory upper limits for bail amounts; for example, bail cannot be set in excess of $50,000 "if the defendant is charged with a felony that involves a crime committed against a person," other than a form of homicide. Tenn. Code Ann. § 40-11-105. In addition to those limits, the court is required, as the U.S. Constitution mandates, to set a bail amount "as low as the court determines is necessary to reasonably assure the appearance of the defendant as required." Tenn. Code Ann. § 40-11-118(a). Throughout this process, the courts must follow the procedural safeguards imposed by the U.S. Constitution's guarantee, in the Fourteenth Amendment, that an individual cannot be deprived of his liberty without due process. *See Burgins*, 464 S.W.3d at 307.

Once monetary bail is set, the defendant can pay that monetary bail by either (1) paying the full amount himself, (2) hiring a surety, most typically in the form of a for-profit bail bondsman, or (3) using real property as collateral. *See* Tenn. Code Ann. §§ 40-11-118(a), 40-11-122. Once his bail is paid, he is released, with the expectation that he will attend all future required court dates, as well as comply with any other conditions of his release. "If the defendant whose release is secured . . . does not comply with the conditions of the bail bond, the court having jurisdiction shall enter an order declaring the bail to be forfeited." Tenn. Code Ann. § 40-11-139(a); *see also* Tenn. Code Ann. § 40-11-201. However, "[i]f the conditions of the bail bond

have been performed and the defendant has been discharged from all obligations in the cause, the clerk of the court shall return to the defendant, unless the court orders otherwise, the entire sum which had been deposited." Tenn. Code Ann. §§ 40-11-119.

    2. **Local Administrative and Judicial Responsibilities.** As should be apparent, the state's system of pretrial detention, release, and surety reflects an overlay of both federal and state requirements. The list of governmental units involved, however, does not end there. "The judicial power of the state is vested in judges of the courts of general sessions, . . . , circuit courts, [and] criminal courts," as well as other courts established by the state. Tenn. Code Ann. § 16-1-101. The state's trial courts are divided among "thirty-one (31) judicial districts" defined by statute. Tenn. Code Ann. § 16-2-506. The state courts located in Metropolitan Nashville and Davidson County ("Metro Nashville" or "Metro"), for example, make up the Twentieth Judicial District. Tenn. Code Ann. § 16-2-506(a)(20)(A)(1).[2] The judges of each individual judicial district are authorized to promulgate their own Local Rules, as long as those rules are "consistent with the statutory law, the rules of the supreme court and the rules of criminal and civil procedure." Tenn. Code Ann. § 16-2-511. Among those Rules may be rules governing the process of reviewing pretrial detention decisions, as is the case in the Twentieth Judicial District, which has a fairly lengthy and detailed set of Local Rules of Practice for Bail Bonds. (*See* Docket No. 4-2.)

    General sessions courts add another layer of complexity, because they are not denominated as state courts at all; rather, they are established and maintained on a county-by-county basis. See Tenn. Code Ann. § 16-15-102. General sessions judges have their own authority to "adopt such rules as may be necessary to expedite the trial and disposal of cases."

---

[2] Other districts, however, span multiple counties. For example, the thirteenth judicial district spans seven counties: "Clay, Cumberland, DeKalb, Overton, Pickett, Putnam and White." Tenn. Code Ann. § 16-2-506(a)(13)(A).

Tenn. Code Ann. § 16-15-406. The Local Rules of Practice for Bail Bonds for the Twentieth Judicial District also apply to Metro's General Sessions courts. (*See* Docket No. 4-2 at 1.)

Finally, the pretrial release-related work of each relevant court is divided among various personnel. According to NCBF, bail amounts, at least in Metro Nashville, are typically first set by judicial commissioners and may be reviewed by either a General Sessions judge or a Criminal Court judge. (Docket No. 1 ¶ 13.) The judges and judicial commissioners, however, do not directly administer the actual payment of bail amounts. Tennessee also relies on a system of clerks of court, whose duties are "to attend the court and perform all the clerical functions of the court." Tenn. Code Ann. § 18-1-101. Among the clerk's duties, at the circuit and criminal court level, is accounting for the court's revenues. Tenn. Code Ann. § 18-4-103(3), (7)–(8). As relevant to the pretrial release system, the clerk of the court accepts bond payments and accounts for the funds once they are received. When a defendant or third party gets a surety back, it is the clerk that transmits the funds. (Docket No. 4-1 ¶¶ 21–27.)

The clerk of the criminal or circuit court of a judicial district is empowered to act as the clerk for a General Sessions Court, despite the fact that General Sessions Courts, in Tennessee's system, are county, rather than state-level, courts. Tenn. Code Ann. §§ 16-15-301, 18-4-201. For example, the Metro Code and Charter instructs the local criminal court clerk to operate the criminal portion of the metropolitan government's general sessions docket. Charter of the Gov. of Metro. Nashville & Davidson Cty. § 14.20.

## B. Effect of a Failure to Obtain Pretrial Release

The first and most obvious effect of a defendant's failure to obtain pretrial release— either because conditions of release were wholly denied or because bail was set and he could not afford it—is the deprivation of the defendant's liberty. As the court has already discussed, the

pretrial defendant's liberty interest, in and of itself, is entitled to substantial constitutional protection. However, focusing narrowly on the abstract concept of liberty, if anything, risks downplaying the full stakes of the pretrial detention determination in many cases. Whether a defendant facing prosecution is released to await trial not only affects his short-term freedom; there is evidence suggesting that it affects the course of his entire criminal case and, by extension, potentially the course of his life. NCBF has provided a July 2016 study of thousands of misdemeanor cases in Harris County, Texas, showing that, controlling for a number of variables, defendants who remained in pretrial detention were 25% more likely to plead guilty than similarly situated defendants who were released and were 43% more likely to receive jail time. When sentenced, the detained defendants' sentences were, on average, more than twice as long. (Docket No. 4-13 at 2, 19–21.) There may, of course, be many ways that one could take issue with that study. Based on the current record before the court, however, the evidence, at the very least, broadly supports its conclusions.

It is, moreover, not difficult to imagine why detention would have a negative effect on an individual's criminal defense. The government has much greater leverage over an incarcerated person than a free person. A person on pretrial release can continue to work, make money, and take part in family life, while a detained person may lose his job or even custody of his children. A person on pretrial release can also participate more directly and comprehensively in his defense. He is significantly less likely to be under the intense surveillance present in jailhouses, particularly regarding conversations with the outside world. He can seek continuances—for example, to investigate exculpatory or mitigating evidence—without each continuance meaning more time in jail. Finally, he will not be subject to the daily psychological toll of incarceration and can make decisions about how to proceed with his case surrounded by family and friends. In

turn, pretrial release deprives the government of the bargaining chip that accepting a quick deal may get the defendant out of confinement sooner. That enticement is likely to be especially strong in misdemeanor and minor felony cases, which are likely to carry a short sentence after conviction but which can have long-ranging effects on the defendant's life, due to their civil and criminal collateral consequences.

Pretrial detention is an established part of the U.S. criminal justice system, and NCBF does not, at least in this litigation, dispute that it is at least sometimes appropriate. Some defendants, therefore, cannot avoid the disadvantages associated with waiting for trial from a jail cell rather than their homes. As NCBF points out, however, once a defendant has been assigned a bail amount, a determination has already been made that, at least as long as the right conditions are met, pretrial release is appropriate for him. In such a situation, the defendant who can afford to make bail will face a decidedly different, and likely more forgiving, path forward for his case than a defendant who is charged with the same crime and received the same release conditions, but who cannot afford his own release.

## C. NCBF, Tenn. Code § 40-11-121, and Davidson County Rule 10(B)

**1. NCBF's Charitable Model.** In 2016, individuals concerned about the role of money bail in Metro courts founded NCBF as a charitable fund for the purpose of "free[ing] low-income persons from jail and work[ing] to end wealth-based pretrial detention." (Docket No. 4-1 ¶ 4.) The NCBF posts cash bail on behalf of selected pretrial detainees—not as a for-profit bonding company, but as part of its mission to combat differences in the pretrial detention process based on wealth. NCBF, like a for-profit company, takes steps to communicate with the defendants whose releases it has secured, to ensure that they return to court as required. (*Id.* ¶¶ 4, 8.)

In order to fund its efforts, NCBF relies on what its current manager, Rahim Buford, refers to as "a revolving fund of donated money." (*Id.* ¶ 4.) NCBF posts bond for a pretrial detainee and, when the detainee's case is completed, NCBF accepts the refund of its surety, which it puts back into its budget for posting bond for another pretrial detainee. Accordingly, a single donation of $1,000, for example, can be used over and over again to secure pretrial release for a series of defendants with $1,000 bail amounts. (*Id.*) Since its founding, NCBF has posted bail in over 1,000 cases, representing a total of over $2.3 million in bail. That $2.3 million, however, consists of a much smaller number of individual dollars, cycled through NCBF's system repeatedly. (*Id.* ¶ 10.)

In order for NCBF's revolving fiscal model to be sustainable, NCBF must be able to obtain a refund of at least a substantial portion of the money it uses to post bail. Tennessee, however, has a statute—Tenn. Code Ann. § 40-11-121—requiring that, in cases where bond was paid "by defendant, the deposit shall be applied to the payment of" any fines or court costs. NCBF maintains that that provision does not apply to its deposits, because it posts bail as a third-party surety. Nevertheless, the Criminal Court's local rules include a provision—Rule 10(B) of the Local Rules of Practice for Bail Bonds—stating that "*[a]ny individual* who desires to deposit a cash bond with the Clerk pursuant to [Tenn. Code Ann.] § 40-11-118 shall be notified in writing by the Clerk that such cash deposit shall be returned subject to any fines, court costs, or restitution as ordered by the Court." (Docket No. 4-2 at 10 (emphasis added).) Rule 10(B), as interpreted and applied by the Clerk's Office, extends the garnishment policy to bail set by third parties, including NCBF, which poses an obstacle to NCBF's revolving fiscal model. [3]

---

[3] Technically, on its face, Rule 10(B) does not actually require garnishment, but merely *notice* that garnishment will occur. The Clerk's Office, however, has interpreted the Rule as stating the garnishment policy of the Criminal Court and requires individuals posting bond to agree to garnishment consistently with the Rule. See Docket No. 4-3 (acknowledgment form for Rule 10(B) policy).)

**2. NCBF's Exemption from Garnishment.** According to Buford, the Twentieth Judicial District, in recognition of this problem, granted NCBF what he characterizes as "an exemption to [Rule 10(B)]," not requiring that the amounts posted by NCBF to be applied to fines, costs, taxes, or restitution. (Docket No. 4-1 ¶ 19.) This exemption was apparently formalized in an *en banc* Order of the Criminal Court in April of 2016. (*See* Docket No. 4-4 at 1.)

On May 6, 2019, however, the Criminal Court released a second *en banc* Order, rescinding the exemption. (*Id.*) The court characterized the prior Order as having "effectively exempted the NCBF from the statutory requirement under Tennessee Code Annotated § 40-11-121 and from the requirement in the Court's local rules that a cash bond deposited with the Clerk pursuant to Tennessee Code Annotated § 40- 11-118 shall be returned subject to any fines, court costs, or restitution ordered by the Court." (*Id.* at 1.) However, the court wrote, "several issues ha[d] arisen since entry of the April 6, 2016, order that ha[d] caused the Court to reconsider the NCBF's exemption." (*Id.*) First, the court noted, two judges of the court had retired and their positions had been filled by two new Criminal Court judges who had not taken part in the consideration of the initial Order. Second, the court wrote that it had "been made aware by the Davidson County Criminal Court Clerk's Office that as of April 18, 2019, there are $ 104,200 in conditional forfeits on bonds posted by the NCBF." (*Id.* at 1–2.) The court explained that "[t]his level of exposure" was "far beyond what the Court contemplated when the April 6, 2016, order was entered." The court wrote that, "particularly in light of the amount of conditional forfeitures currently outstanding," it was "concerned by the NCBF's lack of sufficient and specific measures to ensure a defendant's appearance in court." (*Id.* at 2.)

Shortly after that Order was entered, the Criminal Court stayed the Order's operation at NCBF's request, to allow for motions challenging the end of the exemption. NCBF filed a

petition to amend the May 2019 Order and reinstate the policy of the April 2016 Order. (Docket Nos. 4-6 to -8.) The Criminal Court, sitting *en banc*, heard oral argument regarding the pending change on July 18, 2019. (*See* Docket No. 4-5 at 1.) On August 29, 2019, the court entered an *en banc* Order denying NCBF's petition. (*Id.*) The court "reaffirm[ed]" its earlier rationale for ending the exemption. (*Id.* at 2.) It added, however:

> [T]he Court notes that in no way does it intend for this Order to force the NCBF to shut down. As the Court stated at the hearing on July 18, 2019, this Court agrees with the NCBF's contention that the work in which they are engaged is a noble service to the community. The Court continually strives to ensure that the administration of the criminal justice system is fair and equitable for all parties, and is willing to work with the NCBF or any other organization to that end. However, while the Court hopes that the NCBF continues its work, for the aforementioned reasons, the Court is of the opinion that cash bonds posted by the NCBF should not automatically be exempted from being used to satisfy the fines, costs, or restitution that other parties posting cash bonds are generally required to satisfy. Of course, a defendant on a bond made by the NCBF, just like any other defendant, may still petition the appropriate court for waiver of any costs or fines based upon the defendant's indigency upon entry of any judgment against them. Bond funds paid by the NCBF would still be refunded if all costs, fines, and fees were waived by that court.

(*Id.* at 2–3.)

Bail amounts are paid through the Clerk of the Criminal Court—that is, through the office that defendant Gentry oversees and represents. According to Buford, the office will no longer accept NCBF's payments unless the NCBF representative making the payment signs the office's notification form acknowledging that the bail amounts will be applied to fines, fees, costs, taxes, or restitution. (Docket No. 4-1 ¶ 22.) Officials from Gentry's office have informed NCBF that the garnishments are applied automatically by the clerk's office, with no hearing devoted to the garnishments. Rather, when NCBF or another bail depositor seeks a refund of its surety at the end of the defendant's case, the clerk provides only the amount that exists after deducting fines, fees, costs, taxes, and restitution. (*Id.* ¶¶ 24–27.)

Buford states that, now that NCBF has lost its exemption from garnishment, it "stands to rapidly lose its revolving fund." (*Id.* ¶ 28.) It has reduced its operations and instituted new caps both on the amount it will post in any particular case and the total amount it will post in any given month. (*Id.* ¶¶ 29–30.) He estimates that NCBF has rejected at least thirty requests from defendants for bail that it otherwise would have approved if the Criminal Court had continued its policies unchanged. (*Id.* ¶ 31.) He estimates that NCBF is likely to lose "half of all its deposits subject to garnishment" going forward. (*Id.* ¶ 34.)

**D. This Litigation**

On February 5, 2020, NCBF filed a Complaint for Injunctive and Declaratory Relief, in which it named, as the sole defendant, "Hon. Howard Gentry, Criminal Court Clerk, *in his official capacity*." (Docket No. 1 at 1.) NCBF pleaded three causes of action under 42 U.S.C. § 1983: first, for violation of the Eighth Amendment right against excessive bail; second, for violation of the Fourteenth Amendment, based on the imposition of unconstitutional conditions; and, third, for violation of the Fourteenth Amendment right to due process. (*Id.* ¶¶ 62–78.) On the same day, NCBF filed a Motion for Preliminary Injunction, asking the court to enjoin Gentry "from (1) enforcing Davidson County Local Rule Governing Bail Bonds 10(B) as well as (2) enforcing his office's policy of conditioning the acceptance of cash bonds on receipt of a signed form acknowledging future payment of criminal debts from that cash bond (collectively "the garnishment policies")." (Docket No. 3 at 1.)

Pursuant to Fed. R. Civ. P. 4(b), NCBF requested, and the court issued, a summons directed to Hon. Howard Gentry at 408 2nd Avenue in Metro Nashville on February 6, 2020. (Docket No. 9.) The same day, NCBF returned a completed proof of service. (Docket No. 10.) The proof of service described the method of service as follows: "I served the summons on

Cynthia Gross, attorney for Metro-Nashville Government Department of Law, who agreed to accept service on behalf of Howard Gentry." (*Id.* at 1.) It was signed and dated by Lauren Davis, who identified herself as the Legal Program Coordinator of ACLU-TN. (*Id.*)

NCBF has filed a Declaration by one of its attorneys, C. Dawn Deaner, stating that she spoke with Gross by telephone on February 3, 2020, and informed her that NCBF would be suing Gentry in his official capacity as Clerk of the Criminal Court. Deaner asked Gross if Gross could accept service on Gentry's behalf, and Gross responded that she would have to get back to Deaner on that matter. Deaner and Gross spoke again later that day, at which time Gross, according to Deaner, "informed me that either she or someone else with her office had spoken directly with Mr. Gentry, and he had agreed to her Office accepting service of this lawsuit on his behalf. As a result, Ms. Gross informed me that her Office would accept service of the lawsuit on behalf of Mr. Gentry." (Docket No. 21 ¶¶ 3–4.) Finally, Deaner states that, to avoid any further delay, NCBF served Gentry personally on March 12, 2020. (*Id.* ¶ 8; *see* Docket No. 21-1.)

On February 20, 2020, Gentry filed a Response opposing the Motion for Preliminary Injunction. (Docket No. 15.) The Response was filed and signed by Allison L. Bussell of the Department of Law of the Metropolitan Government of Nashville and Davidson County ("Metro Legal"), and also listed Metro Director of Law Robert E. Cooper, Jr., and Metro Legal attorney John W. Ayers as representing Gentry. (*Id.* at 4.) Gentry, through Metro Legal, stated that he was "enter[ing] this appearance exclusively in his capacity as an elected official for the Metropolitan Government of Nashville and Davidson County." (*Id.* at 1.) He argues that, as relevant to this case, he was, at all times, "acting as an agent of the State of Tennessee," not Metro. Accordingly, he argues, he, in his ostensible Metro-related capacity, "has no interest in whether the state

policy at issue is enforced or enjoined." Citing that lack of an interest, Gentry states that he "takes no position on Plaintiff's motion for preliminary injunction." (*Id.* at 1.)

On February 24, 2020, NCBF filed a Reply. (Docket No. 26.) In its Reply, NCBF argues that its suit is permissible regardless of whether Gentry was acting, at the relevant times, as an agent of the State of Tennessee or in a more local capacity. NCBF argues that, as the government official in charge of administering the challenged program, Gentry, in his official capacity, is an appropriate defendant—with the state/local distinction relevant only to whether NCBF must rely on *Ex parte Young*, 209 U.S. 123 (1908), to obtain relief regardless of state sovereign immunity. (*Id.* at 2.)

On February 27, 2020, Gentry filed a Motion to Dismiss, asking the court to dismiss NCBF's claims, "insofar as the Court construes the claims as proceeding against Mr. Gentry in his capacity as a Metropolitan Government official." (Docket No. 17 at 1.) In support of the motion, Gentry reiterates his argument that he enforces Rule 10(B) "on behalf of the State of Tennessee" and contends that, "if this case is proceeding against Mr. Gentry in his official capacity as a state agent, Plaintiff must serve the Attorney General, which [it has] not done." (Docket No. 18 at 7–8.) NCBF filed a Response, reiterating its position that Gentry is an appropriate defendant and pointing out that Gentry cited no authority for his proposition that NCBF must serve the Tennessee Attorney General. (Docket No. 19.) On March 10, 2020, Gentry filed a Reply, arguing that "[t]he local- or state-capacity distinction is relevant to service of process because Mr. Gentry was served only via the Metropolitan Department of Law, which has no authority to accept service of process for state officials." (Docket No. 20 at 1 (citing Tenn. R. Civ. P. 4.04(1).)

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "Although no one factor is [otherwise] controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

### B. Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## II. ANALYSIS

The parties' briefing raises four closely related, but distinct, issues: (1) whether the Tennessee Attorney General should have been given notice of this suit; (2) whether Gentry was served under the correct method in light of the nature of his office; (3) whether Gentry is an appropriate defendant in this case, rather than some other, presumably state-level official; and (4) whether NCBF has established that it is entitled to a preliminary injunction. The court will turn to each of these issues in order.

## A. Notice to the State of Tennessee

Rule 5.1(a) of the Federal Rules of Civil Procedure requires that "[a] party that files a pleading, written motion, or other paper drawing into question the constitutionality of a . . . state statute must promptly . . . file a notice of constitutional question stating the question" with the state's attorney general, unless the parties to the case already "include the state, one of its agencies, or one of its officers or employees in an official capacity." The court has its own

obligation to inform the State of Tennessee when the constitutionality of one of its statutes is in question, pursuant to Rule 5.1(b) and 28 U.S.C. § 2403(b), if none of the parties is an "agency, officer, or employee" of the state. Rule 5.1 requires only prompt, not immediate, notice, and there is no indication in the rule that failing to provide the required notice immediately after a party raises a constitutional issue is fatal to a claim. However, "[i]n cases in which neither the parties nor the district court notifies the appropriate official of the constitutional challenge, any orders of the court must be stayed or vacated until the United States Attorney General or state attorney general has had an opportunity to intervene." Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1154 (4th ed.) (citing *Oklahoma ex rel Edmondson v. Pope*, 516 F.3d 1214 (10th Cir. 2008); *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Software Int'l., Inc.*,No. 07-cv-665-bbc 2008 WL 3842920 (W.D. Wis. Aug. 18, 2008)).

NCBF argues, first, that Rule 5.1(a) should not apply here because Gentry is, by his own admission, an agent of the state of Tennessee, meaning that an "officer[] or employee[]" of the state is already a party to the suit.[4] NCBF is correct that Gentry has characterized himself as an "agent" of the state for some purposes, but, even if that is so, it does not necessarily follow that he is an "officer" or "employee." Moreover, the purpose of Rule 5.1 and 28 U.S.C. § 2403(b) is to protect the interests of the state, regardless of the interests of the individual litigants; it would be contrary to that purpose to allow a litigant to effectively waive the state's right to notice through his admissions. The court, therefore, must determine whether Gentry is an officer or employee of the State of Tennessee.

In his briefing, Gentry characterizes his roles as divisible between two capacities: that of "an elected official for the Metropolitan Government of Nashville and Davidson County"; or, in

---

[4] NCBF also disputes that it is "drawing into question" the constitutionality of any Tennessee statute. Because the court will conclude that no further notice would be required regardless, it will not address that issue.

the alternative, that of "an agent of the State of Tennessee." (Docket No. 18 at 1.) Neither characterization, however, fully captures the nature of his authority. As a Clerk of Court, his power derives from the Criminal Court of the Twentieth Judicial District the "clerical functions" that are delegated to his office by statute. Tenn. Code Ann. § 18-1-101. The court, in turn, is a distinct entity created by Tennessee statute and "vested" with the judicial authority of the state. Tenn. Code Ann. § 16-1-101. Most directly, then, Gentry is an employee of the Office of the Clerk of the Criminal Court of the Twentieth Judicial District ("Clerk's Office"). The Twentieth Judicial District may be the same size as Metro, but Tennessee statutes do not treat them as interchangeable. The courts of that district are separately created entities exercising the state's judicial power pursuant to a direct delegation from the state, not through Metro.

On the other hand, however, the court cannot assume, merely because the courts of the Twentieth Judicial District were created by the state and exercise authority granted by the state, that those courts are synonymous with the state for Rule 5.1 purposes. After all, every type of local government—whether a judicial district, school district, utility district, municipality, county, hospital authority, or something else—"is but an emanation from the state." *Maury Cty. ex rel. Maury Reg'l Hosp. v. Tenn. State Bd. of Equalization*, 117 S.W.3d 779, 787 (Tenn. Ct. App. 2003) (quoting *State ex rel. Bell v. Cummings*, 172 S.W. 290, 290 (Tenn. 1914)); *see also S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) (observing that local governments "derive the whole of their authority solely from the General Assembly") (quoting *Mayor & City Council v. Linck*, 80 Tenn. (12 Lea) 499 (1883)). That Gentry's power comes from the state only puts him in the same boat as every other arguably local official.

Fortunately, there is established caselaw for assessing whether a state-created body is an extension of the state or, instead, an entity that, although it was created by the state, is distinct in

the eyes of the law. The issue most often comes up in the context of sovereign immunity, pursuant to which "arms of the state" are entitled to immunity, while "political subdivisions" are not. *See Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (*en banc*). That inquiry calls on the court to engage in a multi-factor balancing test, considering "(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government." *Id.* at 359 (citing *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 44–45 & 51 (1994)); *see also Ermold v. Davis*, 936 F.3d 429, 433 (6th Cir. 2019); *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 326 (6th Cir. 2010); *Barachkov v. 41B Dist. Court*, 311 F. App'x 863, 867 (6th Cir. 2009); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 473 (6th Cir. 2005).

Applying that multi-factor test, the Sixth Circuit has already held, in a published decision, that a Michigan state court is an arm of the state, not a political subdivision. *See Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 764 (6th Cir. 2010). In support of that ruling, the Sixth Circuit cited Michigan's "unified state judicial system . . . under the control and administration of the Michigan Supreme Court" and the "considerable state control over judicial officers' appointments" and removal. *Id.* at 762–63. Although the courts of Tennessee and Michigan are not identical, a similar analysis can be applied here. The Tennessee Supreme Court, like the Michigan Supreme Court, has emphasized its inherent power to oversee the courts of the state, *see State v. Mallard*, 40 S.W.3d 473, 480 (Tenn. 2001), and its "general supervisory control over all the inferior courts of the state" is enshrined in statute.[5] Tenn. Code Ann. § 16-3-501. Criminal

---

[5] For example, the Tennessee Supreme Court, relying on its "constitutional, statutory, and inherent authority," recently entered an Order suspending most "in-person proceedings in all state and local courts

court vacancies are filled by a state-level, not a local, process. *See* Tenn. Code Ann. §§ 17-1-301(b), -4-301. The Tennessee General Assembly, moreover, has the power to remove judges. Tenn. Const. art. V, § 4; Tenn. Const. art. VI, § 6.

Admittedly, the fact that a Tennessee judicial district has a limited geographic jurisdiction makes it look, from at least one angle, more like a local government than a state agency. Indeed, a different area of Tennessee law defines "political subdivision" to mean "any city, town, municipality, county, including any county having a metropolitan form of government, or other legally authorized local governmental entity *with jurisdictional boundaries*." Tenn. Code Ann. § 4-18-102(4), *cited in Smith Cty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, 304 S.W.3d 302, 311 (Tenn. 2010). The Twentieth Judicial District certainly has jurisdictional boundaries like a local government. The same argument, however, could have prevailed regarding the Michigan court in *Pucci*, but it did not.

The court also notes that at least some aspects of Gentry's duties—namely those involving General Sessions courts, which are operated at the county level—are more closely related to a political subdivision than the powers at issue in *Pucci*. A conclusion that some of Gentry's duties involve a political subdivision, however, would not preclude a holding that he is, in his capacity as Clerk of the Criminal Court, a state officer or employee. The relevant exceptions to the notification obligations of the court and the plaintiff focus only on whether Gentry is a state employee, not on whether he is *only* a state employee.

Because *Pucci* was not explicitly about Rule 5.1 or 28 U.S.C. § 2403(b), it is not technically determinative of this case. The issues, however, are so closely related that this court finds the reasoning of *Pucci* to be inescapable. The most plausible and consistent reading of Rule

in Tennessee." *In re Covid-19 Pandemic*, Order No. ADM2020-00428 (Tenn. Mar. 13, 2020), *available at* http://www.tncourts.gov/sites/default/files/docs/covid-19_order.pdf.

5.1 and 28 U.S.C. § 2403(b) is that they define the boundaries of the State of Tennessee in essentially the same manner as the U.S. Constitution. The court, accordingly, determines that the Criminal Court—and, by extension, the Clerk's Office—is an arm of the State of Tennessee, and Gentry is its officer or employee. NCBF was not, therefore, required to grant additional notice to the state.

## B. Adequacy of Service

In his partial Motion to Dismiss, Gentry argues that service to the Clerk's Office was ineffective because it was not performed through the state's Attorney General. NCBF responds that Metro Legal affirmatively accepted service on Gentry's behalf and indeed does not appear to dispute that it was authorized to do so in at least a limited manner. It argues that Gentry's distinction between his state and local duties is not relevant to the issue of service.

Because Gentry is sued in his official capacity, the suit is "equivalent of a suit against the governmental entity" he represents—that is, the Clerk's Office. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). As the court has already held in this opinion, that office is an arm of the state of Tennessee for the purposes of the Federal Rules of Civil Procedure. Pursuant to Rule 4(j)(2), "[a] state, a municipal corporation, or any other state-created governmental organization that is subject to suit must be served by: (A) delivering a copy of the summons and of the complaint to its chief executive officer; or (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant."

Tennessee law requires service on the State of Tennessee or any "agency thereof" to be performed "by delivering a copy of the summons and of the complaint to the attorney general of the state or to any assistant attorney general." Tenn. R. Civ. P. 4.04(6). It is undisputed that that was not done here. NCBF, therefore, did not effect service in the method prescribed by the State

of Tennessee and cannot rely on Rule 4(j)(2)(B). Rule 4(j)(2)(A), however, also permits NCBF to serve the summons on the defendant agency's "chief executive officer." *See* Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1109 (4th ed.) ("Rule 4(j)(2)(A) permits service to be made by delivering a copy of the summons and the complaint to the 'chief executive officer' of the governmental unit."). It appears to be beyond dispute that Gentry is the chief executive officer of the Clerk's Office. Nor does Gentry appear to dispute that Metro Legal was authorized to accept service on his behalf, in his capacity as Clerk, for at least some purposes. He argues only that Metro Legal is not empowered to represent him insofar as he is sued as an "agent of the state," which he takes to mean that service also could not be made through Metro Legal. But he points to no rule that service can only be accepted by a representative of the entity that will ultimately represent him in the underlying litigation. Indeed, service in a lawsuit is frequently performed before the defendant has an attorney at all. The issues of service and representation are simply distinct concepts, and Gentry has cited no authority for the linkage that he imputes to them here. Service through Metro Legal was therefore appropriate if it falls within the boundaries of Rule 4(j)(2)(A)'s requirement that the summons and Complaint be "delivered" to Gentry, regardless of who is empowered to represent the Clerk's Office in its defense.[6]

Rule 4(j)(2)(A) is not entirely clear with regard to how service on a chief executive of a governmental entity must be accomplished, but it does not expressly require "personal" service, requiring only that the summons and complaint be "delivered" to the officer. Other provisions of Rule 4, in contrast, specifically refer to "delivering a copy . . . personally," *see* Fed. R. Civ. P 4(e)(2)(A), (f)(2)(C)(1), which would seem to leave open the possibility of a form of delivery involving at least some intermediary beyond what is required for personal service directly on the

---

[6] It appears that direct personal service has, in fact, now been completed on Gentry. However, because that service was only completed on March 12, 2020, the court must consider the adequacy of the earlier service in order to determine whether it can rule on the Motion for Preliminary Injunction at this time.

chief executive officer. On the other hand, however, courts have generally held that "delivery," as a "term of art," requires more than service by mail. *Gleeson v. McDonald*, No. 3:08-CV-126, 2009 WL 1684447, at *4 (D.N.D. June 15, 2009), *aff'd*, 377 F. App'x 577 (8th Cir. 2010); *see Lee v. Caruso*, No. 1:07-CV-139, 2009 WL 4042744, at *2 (W.D. Mich. Nov. 20, 2009) (stating, without analysis, that Rule 4(j)(2)(A) requires the plaintiff to "personally effect service" on the chief executive officer); 1 Moore's Federal Practice - Civil § 4.58[1] ("The summons and complaint must be personally delivered."); Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1109 (4th ed.) ("Once the [chief executive] officer's identity is determined, the word 'delivering' in Rule 4(j) indicates that personal service should be made upon that particular individual."). NCBF, therefore, could not have satisfied Rule(j)(2)(A) solely by relying on the mail. NCBF, however, did not rely on the mail, instead serving the summons, in person, on Cynthia Gross, who represented that she had express authority to accept on behalf of Gentry in his official capacity.

At least some courts have held that service is sufficient under Rule 4(j)(2)(A) if all of the elements of personal service are accomplished other than the fact that the personal service was made on a subordinate of the chief executive officer, who then completed the final step of passing the summons and complaint along. *See Neil v. Randolph*, Case No. 09-6242, 2010 WL 1727809, at *3 (E.D. La. Mar. 17, 2010), *report and recommendation adopted*, 2010 WL 1727806 (E.D. La. Apr. 28, 2010); *S.J. ex rel. S.H.J. v. Issaquah Sch. Dist.*, No. C04-1926RSL, 2007 WL 764916, at *1 (W.D. Wash. Mar. 8, 2007). Requiring personal service—but allowing the service to be made, in the first instance, on an appropriate subordinate official—makes sense in light of the practical difficulties (and security risks) related to gaining physical access to high-ranking government officials. It is, moreover, consistent with the omission of the word

"personally" from Rule 4(j)(2)(A), while still avoiding frowned-upon methods such as service by mail.

The court is guided by the reminder that "Rule 4 is a flexible rule which principally requires sufficient notice to the party of claims brought against it . . . ." *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987) (citing *United Food & Commercial Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984)); *see also Dixie Rests., Inc. v. Philips Consumer Elecs. Co.*, No. 02-2461 D/A, 2005 WL 948802, at *1 (W.D. Tenn. Feb. 18, 2005) ("Courts construe provisions of Rule 4 liberally in order to uphold service, requiring only 'substantial compliance.'") (quoting *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir.1982)). This court, accordingly, will join those courts that have held that adequate service through Rule 4(j)(2)(A) may be accomplished if the plaintiff serves an official who acts as an agent of the chief executive officer and represents that she is an appropriate recipient of service on behalf of the chief executive officer.

Although Cynthia Gross was not one of Gentry's immediate employees when she accepted service on his behalf, she was still acting as an agent of the Clerk's Office and represented that she could accept service on behalf of that office. Indeed, even now, Metro Legal does not appear to dispute that it was, in fact, authorized to—and did—accept service on behalf of Gentry in his official capacity. Instead, it merely seeks to slice and dice that official capacity into state and local components.

Gentry is correct that the same person may require service in multiple different ways based on his different capacities, and service in one such way is not necessarily sufficient for another. Specifically, the Sixth Circuit has held that, when an individual is sued in both his individual and his official capacity, the plaintiff must properly effect service in both capacities.

*See King v. Taylor*, 694 F.3d 650, 657 (6th Cir. 2012). That rule, however, is merely a natural extension of Rule 4(b)'s requirement that service be made on each named defendant, combined with the principle that an official capacity suit is not actually a suit against the person, but his agency. Accordingly, the individual and the office are separate people for the purposes of Rule 4 and must be served accordingly. Gentry, however, was only sued in one capacity, his official capacity—that is, as the Clerk of the Criminal Court. He has identified no authority for subdividing that identity yet again into two separate persons. There was only one entity for which service was required: the Clerk's Office. That office was served and does not need to be served again.

Finally, the court notes that, even if it had not construed Rule 4(j)(2)(A) in the manner that it has, the undisputed evidence suggests that Gentry waived any objection to adequacy of service through Gross and Metro Legal. There is no evidence disputing that Gentry did, in fact, authorize Gross to accept service on his behalf or that Gross communicated that assent to counsel for NCBF. The right to receive service in a particular manner is a defendant's to assert, but it is also his to waive. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 351 (1999) ("*Unless a named defendant agrees to waive service*, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights.") (emphasis added). NCBF, in this case, cooperated with Gentry on the issue of service and complied with the method he agreed to accept. The court will not dismiss or delay the case because he changed his mind.

## C. Appropriateness of Gentry as a Defendant

Gentry argues next that the court should dismiss the claims against him, at least in part—as well as refrain from granting a preliminary injunction—because he is merely applying a state

policy that he is required to apply, namely, Tenn. Code Ann. § 40-11-121. NCBF disputes that Gentry is merely applying Tenn. Code Ann. § 40-11-121, noting that statute's alleged limitation that it applies only to bail posted directly by defendants themselves. Even if Gentry is merely applying a statute, however, that would be no reason to dismiss NCBF's claims or deny it preliminary relief. Quite to the contrary, it is well established, under *Ex parte Young*, that the appropriate way to obtain injunctive relief against an unconstitutional statute is by filing suit against an official or officials charged with enforcing the challenged law. 209 U.S. at 156 (holding that injunctive relief is available against officials "clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act"). As the Sixth Circuit has observed, that is why, for example, a plaintiff challenging a state marriage statute may do so by suing the clerk who issues marriage licenses. *See Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018) (discussing *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). It does not matter that the defendant official believes himself to be merely following the letter of a statute; the premise of a § 1983 case such as this one is that, by acting according to one statute, rule, or policy that is not constitutional in origin, the defendant official has violated the U.S. Constitution, which takes precedence in the event that the two types of law conflict. *See McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 996 (6th Cir. 2019) (holding that sheriff who enforced probation requirements was appropriate *Ex parte Young* defendant in suit challenging requirements).

Gentry's attempt to recast the same argument as about whether NCBF has challenged a "policy or custom" of his office is similarly misguided. Gentry is correct that, in order to establish that a governmental entity is liable for relief under § 1983, a plaintiff must demonstrate

one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). By Gentry's own account, however, his office does have a policy of deducting fine, cost, tax, and restitution amounts from bail refunds. The fact that that policy is based on Gentry's understanding of his duties under a state statute does not make the policy cease to exist. Gentry's argument that he is only enforcing a state law is, simply put, not a defense in any way to his being named as a defendant in this case.

## D. Motion to Dismiss

The preceding discussion is dispositive of Gentry's Motion to Dismiss. Gentry does not ask the court to dismiss the claims against him, in his official capacity, altogether, but only to dismiss them "insofar as the Court construes the claims as proceeding against Mr. Gentry in his capacity as a Metropolitan Government official." (Docket No. 17 at 1.) Gentry, though, has only been sued in one capacity—his capacity as the Clerk of the Criminal Court of the Twentieth Judicial District. In that capacity, he is plainly an appropriate defendant. Gentry is correct that, other than the fact that Metro operates the underlying General Sessions Court, Metro government's involvement in these matters appears to be limited, which, the court gathers, may have implications regarding whether Metro Legal will continue to represent him. The issue of Gentry's representation, however, is for Gentry to resolve, not the court, and it certainly does not call for any partial dismissal of the appropriately filed and pleaded claims against him and his office. The motion to dismiss will be denied.

## E. Motion for Preliminary Injunction

**1. Likelihood of Success on the Merits.** The court finds itself in the unfortunate position of ruling on NCBF's motion for preliminary injunction with scant, if any, discussion by Gentry of NCBF's likelihood of success on the merits in its lawsuit against him. When NCBF filed its Motion, it gave rise to an obligation, on Gentry's behalf, to file a Response if he opposed the motion. L.R. 7.01(a)(3). Attorneys for Gentry—namely, those from Metro Legal—did file a Response, but it was focused on a narrow range of issues involving, in particular, Gentry's supposed dual roles as a state and local official. The reason for this limited briefing, as far as the court can tell, is that, as Gentry informs the court, Metro Legal "has no authority to appear on behalf of a defendant acting as an official of the State of Tennessee."[7] (Docket No. 15 at 3 n.1.)

---

[7] The Metro Charter defines Metro Legal's functions as follows:

(a) Supervise, direct and control all of the law work of the metropolitan government, except with respect to the electric power board, which, having its own general counsel, is excepted from the provisions of this chapter.

(b) Furnish legal advice to the mayor, to the council and to all officers, departments, boards and commissions concerning any matters arising in connection with the exercise of their official powers or performance of their official duties.

(c) Represent the metropolitan government in all litigation.

(d) Collect by suit or otherwise all debts, taxes and accounts due the metropolitan government which shall be placed with it for collection by any officer, department, board or commission.

(e) Prepare or approve all contracts, bonds, deeds, leases or other instruments in writing in which the metropolitan government is concerned.

(f) Prepare or assist in preparing for introduction any proposed ordinance upon request of the mayor or any member of the council.

(g) Codify and cause to be published in convenient book form once in every five (5) years . . . .

(h) Perform such other duties as may be assigned to it by ordinance.

Charter of the Metro. Gov't of Nashville & Davidson Cty. § 8.601.

If, however, Metro Legal is not responding on behalf of Gentry as a state official, then Gentry should have come to the court with other lawyers who can. Instead, it seems that no one is representing the state in this matter so far, and the Clerk's Office, as an arm of the State, has effectively failed to respond to NCBF's motion *at all*. The court can guess that that failure is because Gentry-the-state-official was hoping to rest on the argument that only Gentry-the-local-official had been served. Of course, Gentry could have come to the court with lawyers empowered to represent him in his state capacity and entered a special appearance disputing the adequacy of service, but he did not.[8] The court, moreover, has rejected the argument that service on Gentry in his official capacity was somehow partial or inadequate. The Motion for Preliminary Injunction is ripe, and there has been no meaningful opposition to it on all but the most limited grounds.

Based on the record currently available, the court concludes that NCBF has established at least a sufficient likelihood of success to support the granting of a preliminary injunction, if the other factors, on balance, support doing so. NCBF bases its Eighth Amendment challenge on the principle, endorsed by the Supreme Court in *Cohen v. United States*, 82 S. Ct. 526 (1962) (Douglas, J., in chambers[9]), that bail that is conditioned on the payment of a fine is "'excessive' in the sense of the Eighth Amendment because it would be used to serve a purpose for which bail was not intended." (*Id.* at 529.) Admittedly, *Cohen* appears to have had a fairly limited effect on

---

[8] The court strongly doubts that attorneys for the State of Tennessee are unaware of this case, but, if they are, the Clerk's Office is certainly free to inform them or, if the state's lawyers are unable to provide representation, to obtain counsel elsewhere. The court notes, from its experience, that it is not uncommon for government entities to employ private counsel for specific litigation.

[9] An "in chambers" opinion is an opinion written and issued by a single judge of a multi-judge court, pursuant to a court rule allowing a lone judge to address certain secondary matters without obtaining concurrence from the full court or a panel thereof. *See* Daniel M. Gonen, *Judging in Chambers: The Powers of A Single Justice of the Supreme Court*, 76 U. Cin. L. Rev. 1159, 1173 (2008). In *Cohen*, Justice Douglas was addressing the issue of the bond amount set for a defendant pending appeal, which he was permitted to do without seeking concurrence of the other members of the Court. 82 S. Ct. at 527.

the Supreme Court's ongoing jurisprudence, and its posture—involving bail pending appeal—was somewhat different from what NCBF's clients face. *But see United States v. Rose*, 791 F.2d 1477, 1480 (11th Cir. 1986) ("We have no doubt that the addition of any condition to an appearance bond to the effect that it shall be retained by the clerk to pay any fine that may subsequently be levied against the defendant after the criminal trial is over is for a purpose other than that for which bail is required to be given under the Eighth Amendment. Such provision is therefore excessive and is in violation of the Constitution."); *United States v. Powell*, 639 F.2d 224, 225 (5th Cir. 1981) ("[W]e [have] rejected the government's argument that the fine should be paid out of bail money because the United States, as a creditor, has the same right as other creditors to apply a debtor's money in its possession to extinguish debts due."); *cf. State ex rel. Baker v. Troutman*, 553 N.E.2d 1053, 1056 (Ohio 1990) (adopting similar reasoning under the Ohio Constitution). The mere fact that *Cohen* has not given rise to much litigation at the Supreme Court level, however, does not mean that its principles can or should be disregarded, particularly given that pretrial release conditions are rarely the type of determination that makes it to the Supreme Court.

NCBF has also advanced a plausible argument that automatically requiring garnishment in every case is not sufficiently narrowly tailored as a policy to survive *United States v. Salerno*, 481 U.S. 739 (1987), which requires a heightened level of scrutiny for the review of pretrial release conditions. Money bail, in and of itself, can survive that heightened scrutiny, as long as it is tailored to the state's compelling interest in ensuring that a defendant returns to court. Requiring a defendant to submit to post-conviction bail garnishment in order to secure his pretrial release, however, has no connection to the strong interest in ensuring his return. Rather, it serves only the significantly lesser interest of enabling the government's future collections. *See*

*Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974) (rejecting fiscal savings as a sufficient basis for justifying constitutionally suspect policy). NCBF argues that, by conditioning release on acceptance of a particular collection mechanism, Tennessee imposes conditions of release that are not justified by a sufficiently strong government purpose. While this argument is an extension of *Salerno*, the court finds, at this stage, that it is, at the very least, a coherent, rational, and persuasive one.

Although NCBF's ultimate success in this case is not a certainty, a preliminary injunction requires, at most, that a plaintiff be "likely to succeed on the merits." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (emphasis added).[10] NCBF has set forth persuasive constitutional grounds for concluding that the Clerk's Office's garnishment scheme fails constitutional muster in at least two ways, and the Clerk's Office itself has offered no reason to disagree. The court, therefore, concludes that this factor favors a granting of the preliminary injunction.

**2. Irreparable Injury to NCBF and the Population it Serves.** NCBF argues that it is likely, if not certain, to suffer irreparable injury if a preliminary injunction is not granted, because the Clerk's Office's garnishments threaten the viability of NCBF's funding model and its ability to pursue its charitable mission. Although the Criminal Court, in its final *en banc* Order, offered some assurances that NCBF might be able to mitigate its damages by seeking waivers of some fines, costs, taxes, and restitution, the evidence before the court shows that this avenue, so far, has not significantly relieved the threat to NCBF's fiscal sustainability. Admittedly, courts have held that "[m]onetary or economic harm by itself" typically "does not constitute irreparable harm." *Ratcliff v. Moore*, 614 F. Supp. 2d 880, 898 (S.D. Ohio 2009)

---

[10] "The courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success. But the verbal differences do not seem to reflect substantive disagreement. All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.3 (3d ed.) (citations omitted).

(citing *State of Ohio ex rel. Celebrezze v. N.R.C.*, 812 F.2d 288, 290 (6th Cir. 1987)). The harm that NCBF has raised, however, is not merely a loss on a balance sheet; it is a threat to the entire model of the group's operation. Every charitable organization needs resources, but, for NCBF, having a churn of money to disburse and draw back is the very essence of its operation.

The risk of irreparable harm to the defendants whom NCBF serves is all the more apparent. Not only do those defendants stand to potentially be deprived of their liberty, despite their eligibility for pretrial release in every way except their ability to amass enough funds, but they are likely, as the court has discussed, to face overall worse outcomes in their criminal cases, which could have negative effects on them in both the short and the long term. An inability to obtain pretrial release may lead to a plea, which may lead to serious collateral consequences, even years into the future.

Finally, the court notes that a finding of at least some irreparable harm is mandated any time a plaintiff's constitutional rights are violated, because the violation of a person's constitutional rights is, in and of itself, irreparable. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the court has discussed, NCBF has not established with certainty that either its or anyone else's rights have been violated or will be violated if the Clerk's Office's garnishments are allowed to continue. It has, however, established at least a substantial probability that that is the case. In light of both the concrete injuries and constitutional considerations at stake, the risk of harm to NCBF and the defendants it assists weighs strongly in favor of granting the preliminary injunction.

**3. Harm to the Clerk's Office/Public Interest.** The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With that in

mind, the court finds that the risk of harm to the Clerk's Office if a preliminary injunction is entered is minimal, while the public interest strongly favors granting the injunction. The most obvious likely harm to the Clerk's Office is that it will no longer be able to rely on bail garnishment in order to collect fines, fees, costs, taxes and restitution. That does not, however, mean that all of those sums will necessarily go unpaid. Some defendants may pay what they owe, as required, directly from their own pockets. If they do not, moreover, the state has a number of options it can rely on to collect. *See* Tenn. Code Ann. § 40-24-105; Tenn. R. Civ. P. 69.05–.07; Tenn. Op. Att'y Gen. No. 06-135 (Aug. 21, 2006). Moreover, there is some evidence suggesting that NCBF's continued operation of a robust caseload may have positive fiscal benefits in the form of relieving the costs of detention. (*See* Docket No. 4-8 at 50 (stating that, for FY2014, the average daily cost of housing a person in Metro jail was $103.40).) Most importantly, there is no evidence that whatever net loss in revenue may occur without garnishment will put any undue strain on the state or the Criminal Court. To the contrary, the court operated without garnishment of bail posted by NCBF for over three years. Although it offered various reasons for discontinuing the practice, none suggested that the lack of garnishments was creating an immediate fiscal crisis for the Criminal Court or the state. Unlike NCBF—a small charitable organization highly vulnerable to fiscal shocks—the government is likely to be able to go about business as usual, regardless of how the court rules on NCBF's motion.

The public interest in allowing NCBF to continue to pursue its mission, in contrast, is great. Indeed, even the Criminal Court judges who adopted the rule being challenged conceded as much in their final *en banc* Order. Moreover, as always, "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch*

*v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). The court therefore concludes that these factors, as well, strongly favor a granting of the preliminary injunction.

**4. Balancing of Factors.** The court reiterates that it would have preferred to rule on this motion with more thorough briefing from Gentry and the Clerk's Office.[11] Nevertheless, NCBF has met its burden of establishing facts in support of its motion, and both the Rules of Procedure and the interests of justice support addressing that motion now. Because all of the factors governing the court's consideration favor granting the preliminary injunction, some of them quite strongly, the motion will be granted.

The court, however, will limit the relief sought in one significant regard. NCBF asks the court to enjoin Gentry's garnishment policies with regard to all defendants and third-party sureties, including those not party to this case. If, in fact, NCBF is able to ultimately demonstrate, conclusively, that the garnishment policy is unconstitutional, then a full cessation of the policy would no doubt be warranted. At this early stage, however, the evidence before the court about hardship and the public interest is overwhelmingly focused on NCBF itself. The court, accordingly, will limit its preliminary injunction to cases in which NCBF posted or will post bond.

## V. CONCLUSION

For the foregoing reasons, the NCBF's Motion for Preliminary Injunction (Docket No. 3) will be granted in part and denied in part, and Gentry's Motion to Dismiss (Docket No. 17) will be denied.

---

[11] Indeed, the court fears that Gentry's partial response may well presage his filing of a motion to reconsider once Gentry resolves his scope-of-representation issues and obtains counsel empowered to assert the interests of the state. The court will address any such motion when it comes but stresses, again, that it was Gentry's decision to proceed in this manner, not NCBF's or the court's. NCBF briefed its motion fully on the merits, presumably on the assumption that those were the grounds on which the motion would be contested.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge