# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| THE NASHVILLE COMMUNITY BAIL FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00103 |
| | ) | Judge Aleta A. Trauger |
| HON. HOWARD GENTRY, Criminal Court Clerk, in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Howard Gentry, in his official capacity as Criminal Court Clerk for the Twentieth Judicial District, has filed a Second Motion to Dismiss (Doc. No. 47), to which the Nashville Community Bail Fund ("NCBF") has filed a Response (Doc. No. 50), and the Clerk has filed a Reply (Doc. No. 52). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND

### A. Pretrial Release and Bail in Tennessee

**1. Constitutional Requirements.** The State of Tennessee, like the federal government and the governments of its sister states, routinely jails individuals who have been charged with, but not convicted of, crimes, pursuant to a common practice known as "pretrial detention." As the state's Supreme Court has observed, the constitutional permissibility of pretrial detention, as a general matter, is widely accepted, and the practice itself dates back to before this nation's founding, having been a feature of the pre-constitutional English courts from which early U.S. courts borrowed many of their organizing principles. *State v. Burgins*, 464 S.W.3d 298, 303 (Tenn. 2015). Also dating back to these pre-constitutional courts and surviving into the

American experience, however, is the admonition that the government's right to pretrial detention is not absolute. *Id.*

For example, under the Eighth Amendment of the U.S. Constitution, the government can deny a defendant pretrial release based on his failure to pay bail—that is, a sum of money or a pledge of surety tied to his future return to court—but only if the bail amount is not "excessive," meaning, in this context, "[b]ail set at a figure higher than an amount reasonably calculated to" provide "adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack v. Boyle*, 342 U.S. 1, 5 (1951). The U.S. Constitution also forbids a court from ordering continued pretrial detention unless certain adequate procedures are observed. *See Schall v. Martin*, 467 U.S. 253, 263 (1984).

Although the U.S. Constitution imposes certain procedural requirements and substantive limitations on the pretrial detention process, it does not mandate that every defendant have the opportunity to secure pretrial release. The Tennessee Constitution, in contrast, requires that "all prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or the presumption great." Tenn. Const. art. 1, § 15. "This constitutional provision grants a defendant the right to pretrial release on bail pending adjudication of criminal charges." *Burgins*, 464 S.W.3d at 304 (citing *Swain v. State*, 527 S.W.2d 119, 120 (Tenn. 1975)). Although this right may be forfeited by a defendant's conduct, every non-capital defendant that enters the Tennessee criminal justice system at least begins with a right to establish some conditions pursuant to which he can obtain his freedom until he is, if ever, convicted.[1] *See id.* at 306.

---

[1] Tennessee's pretrial detention statutes likewise provide that, "[w]hen [a] defendant has been arrested . . . for any bailable offense, the defendant is entitled to be admitted to bail by the committing magistrate, by any judge of the circuit or criminal court, or by the clerk of any circuit or criminal court . . . ." Tenn. Code Ann. § 40-11-105(a).

2

**2. Tennessee's Statutory Bail Process.** Although state and federal constitutions create certain boundaries for the exercise of pretrial detention powers, one must look to the relevant state's statutes and rules to determine how the pretrial detention process will function in any given jurisdiction. Under Tennessee's statutes, pretrial release determinations are intended to be a multi-step process, with each determination flowing from the previous determination, until the least restrictive necessary terms of release are finally set.

For the first step, the court must consider, based on a number of statutorily dictated factors, whether to release a bailable defendant on the defendant's own recognizance or an unsecured bond. Tenn. Code Ann. § 40-11-115(b); *Graham v. Gen. Sessions Court*, 157 S.W.3d 790, 793 (Tenn. Ct. App. 2004) ("A defendant may be released pending trial upon the defendant's own recognizance if the appearance of the defendant can be reasonably assured, in light of several factors set out in the statute. . . . If the defendant does not qualify for release upon recognizance, the magistrate may place conditions upon release . . . ." (citation omitted)). Specifically, the court is directed to consider the following:

> (1) The defendant's length of residence in the community;
>
> (2) The defendant's employment status and history, and financial condition;
>
> (3) The defendant's family ties and relationships;
>
> (4) The defendant's reputation, character and mental condition;
>
> (5) The defendant's prior criminal record, including prior releases on recognizance or bail;
>
> (6) The identity of responsible members of the community who will vouch for defendant's reliability;
>
> (7) The nature of the offense and the apparent probability of conviction and the likely sentence, insofar as these factors are relevant to the risk of nonappearance; and

(8) Any other factors indicating the defendant's ties to the community or bearing on the risk of willful failure to appear.

Tenn. Code Ann. § 40-11-115(b). If those factors support release on the defendants' own recognizance or on an unsecured bond, the court may release him without further consideration. *Id.*

If, however, the statutory factors do not support release on the defendant's own recognizance or on an unsecured bond, the court moves on to the second step of the analysis. In this step, the court considers imposing conditions of release, including non-monetary conditions, that would help ensure the defendant's appearance to stand trial. The court must "impose the least onerous conditions reasonably likely to assure the defendant's appearance in court." Tenn. Code Ann. § 40-11-116(a). The conditions that may be imposed include:

> (1) Releas[ing] the defendant into the care of some qualified person or organization responsible for supervising the defendant and assisting the defendant in appearing in court . . . ;
>
> (2) Impos[ing] reasonable restrictions on the activities, movements, associations and residences of the defendant; and/or
>
> (3) Impos[ing] any other reasonable restriction designed to assure the defendant's appearance, including, but not limited to, the deposit of bail pursuant to § 40-11-117.

Tenn. Code Ann. § 40-11-116(b). Only if the court determines that "conditions on a release on recognizance" have not been shown to reasonably ensure the defendant's appearance, may the court, "in lieu of the conditions of release set out in § 40-11-115 or § 40-11-116, require bail to be given." Tenn. Code Ann. § 40-11-117; *see Graham*, 157 S.W.3d at 793 ("If it is not shown that conditions on a release on recognizance will reasonably assure the defendant's appearance as required, the magistrate shall require that bail be given in lieu of conditions of release.").

If the court determines that it will require bail, it must then—as the third and final step in

its analysis—determine the amount to be required, based on a number of statutory factors listed

in Tenn. Code Ann. § 40-11-118:

(1) The defendant's length of residence in the community;

(2) The defendant's employment status and history and financial condition;

(3) The defendant's family ties and relationships;

(4) The defendant's reputation, character and mental condition;

(5) The defendant's prior criminal record, record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;

(6) The nature of the offense and the apparent probability of conviction and the likely sentence;

(7) The defendant's prior criminal record and the likelihood that because of that record the defendant will pose a risk of danger to the community;

(8) The identity of responsible members of the community who will vouch for the defendant's reliability; however, no member of the community may vouch for more than two (2) defendants at any time while charges are still pending or a forfeiture is outstanding; and

(9) Any other factors indicating the defendant's ties to the community or bearing on the risk of the defendant's willful failure to appear.

Tenn. Code Ann. § 40-11-118(b). The court is required, as the U.S. Constitution mandates, to set

a bail amount "as low as the court determines is necessary to reasonably assure the appearance of

the defendant as required." Tenn. Code Ann. § 40-11-118(a).

Once monetary bail is set, the defendant can pay that bail by either (1) paying the full

amount in cash, (2) hiring a professional surety, typically a for-profit bail bondsman, to file a

written surety to the court for the relevant amount,[2] (3) obtaining approval from the magistrate to

---

[2] If a defendant or his family wishes to hire a for-profit bonding company, it typically costs a non-refundable fee equivalent to 10% of the cash bail amount—meaning that, for those defendants, money

5

file a written surety signed by two non-professional sureties, or (4) using real property as collateral. *See* Tenn. Code Ann. §§ 40-11-118(a), 40-11-122, 40-11-123. Once his bail is secured, the defendant is released, with the expectation that he will attend all future required court dates, as well as comply with any other conditions of his release. At a later date, "[i]f the conditions of the bail bond have been performed and the defendant has been discharged from all obligations in the cause, the clerk of the court shall return to the defendant, unless the court orders otherwise, the entire sum which had been deposited." Tenn. Code Ann. § 40-11-119.

**3. Local Administrative and Judicial Responsibilities.** "The judicial power of the [State of Tennessee] is vested in judges of the courts of general sessions, . . . circuit courts, [and] criminal courts," as well as other courts established by the state. Tenn. Code Ann. § 16-1-101. The state's trial courts are divided among "thirty-one (31) judicial districts" defined by statute. Tenn. Code Ann. § 16-2-506. The state courts located in Metropolitan Nashville and Davidson County ("Metro Nashville" or "Metro"), for example, make up the Twentieth Judicial District. Tenn. Code Ann. § 16-2-506(a)(20)(A)(1).[3]

The state's devolved judicial power is further subdivided between the district's judges, who adjudicate cases, and its court clerks, who "perform all the clerical functions of the court." Tenn. Code Ann. § 18-1-101. Among the clerk's duties, at the circuit and criminal court level, is accounting for the court's revenues. Tenn. Code Ann. § 18-4-103(3), (7)–(8). As relevant to the pretrial release system, the clerk of the court accepts bail payments and accounts for the funds

---

bail exists, as a practical matter, not so much as refundable bond that can be recouped, but rather as a nonrefundable fee that he pays to a private company to shoulder a portion of the responsibility for his return. (Doc. No. 1 ¶ 14.)

[3] Other districts, however, span multiple counties. For example, the thirteenth judicial district spans seven counties: Clay, Cumberland, DeKalb, Overton, Pickett, Putnam, and White. Tenn. Code Ann. § 16-2-506(a)(13)(A).

once they are received. When a party that posted cash bail returns for its refund, it is the clerk that transmits the funds. (Doc. No. 1 ¶¶ 17–19.)

The judges of each individual judicial district are authorized to promulgate their own local rules, as long as those rules are "consistent with the statutory law, the rules of the supreme court and the rules of criminal and civil procedure." Tenn. Code Ann. § 16-2-511. Among those rules may be rules governing the process for reviewing pretrial detention decisions, as is the case in the Twentieth Judicial District, which has a fairly lengthy and detailed set of Local Rules of Practice for Bail Bonds. (*See* Doc. No. 4-2.)

**4. Application of the Pretrial Release Structure in Metro Nashville.** An outside observer who first confronted Tennessee's pretrial release laws—which situate money bail as a last resort and mandate the least onerous release conditions necessary—might assume that money bail is rare, or at least that it is applied somewhat sparingly. The reality, however, is that, "[i]n Tennessee," including in Nashville, "bail is the norm, not the exception." *Fields v. Henry Cty., Tenn.*, 701 F.3d 180, 187 (6th Cir. 2012). Moreover, due to the volume of defendants that pass through the pretrial system in the Twentieth District, initial bail amounts are typically set by judicial commissioners, with only the option to appeal to a General Sessions or Criminal Court judge. (Doc. No. 1 ¶ 13.) *See* Tenn. Code Ann. § 40-5-201(a) & (b)(2) (authorizing the creation of judicial commissioners with the power to "set[] . . . bonds and recognizances").

After a bail amount is set and funding is obtained, an individual goes to the Office of the Clerk to make actual payment. If the person is seeking to pay cash bail on behalf of the defendant, however, he is presented with a document that the court will refer to, for the purposes of this litigation, as the "Clerk's Form." (Doc. No. 1 ¶ 16.) The Clerk's Form requires the signature of the "PERSON TENDERING CASH BOND," and, if that person refuses to sign, the

7

Clerk will not accept the cash bail and accordingly will not relay to the relevant authorities that the defendant should be released. (*Id.* ¶ 18; Doc. No. 1-3 at 2.)

The signatory of the Clerk's Form must acknowledge that he "understand[s]" a number of policies that will be applied to the sum he is about to hand over to the Clerk. Among the statements to which the signatory must agree is:

> I also understand this cash bail is subject to execution for satisfaction of all fines, fees, court costs, taxes and restitution assessed against the defendant in ALL matters related to this warrant/case number(s), probation violation or other post judgment issue. I further understand the person tendering the cash bail is due the refund, upon request, once all fines, fees, court costs, taxes, and restitution are satisfied (the original cash bail receipt and a valid driver's license is required for refund).

(Doc. No. 1-3 at 2.) This portion of the Clerk's Form describes the Clerk's policy pursuant to Rule 10(B) of the Local Rules of Practice for Bail Bonds, which states that "[a]ny individual who desires to deposit a cash bail with the Clerk pursuant to [Tenn. Code Ann.] § 40-11-118 shall be notified in writing by the Clerk that such cash deposit shall be returned subject to any fines, court costs, or restitution as ordered by the Court." (Doc. No. 1-2 at 10.) As Rule 10(B) directs and as the Clerk's Form warns, an individual who seeks the return of his cash bail after the defendant has fulfilled all of his appearance obligations will only receive, from the Clerk, the amount he paid minus any amount that the clerk deducted for fines, costs, or restitution. (Doc. No. 1 ¶ 19.)

## B. NCBF and Rule 10(B)

NCBF is a Nashville-based nonprofit entity founded in 2016 for the purpose of "pay[ing] cash bail for individuals who cannot afford to do so in order to alleviate the harms caused by

unfair wealth-based pretrial detention."[4] (Doc. No. 1 ¶ 11.) NCBF relies on what it refers to as a "revolving fund" in order to post cash bail for as many defendants as possible. In other words, NCBF posts bail for a pretrial detainee and, when the detainee's case is completed, NCBF accepts the refund, which it puts back into its budget and applies toward posting bail for another pretrial detainee. Accordingly, for example, a single charitable donation of $1,000 can be used over and over again to secure pretrial release for a series of defendants, ultimately resulting in far greater than $1,000 in cash bail being paid. (*Id.* ¶ 29.)

In order for NCBF's revolving fiscal model to be sustainable, however, NCBF must be able to obtain a refund of at least a substantial portion of the money it uses to post bail—an uncertain prospect in light of the Clerk's practice of deducting fees, costs, and restitution from refund amounts pursuant Rule 10(B). In recognition of that obstacle and in support of NCBF's mission, the Twentieth Judicial District's Criminal Court Judges, in April of 2016, promulgated a policy exempting NCLB from Rule 10(B). (*Id.* ¶ 30.) Accordingly, when the defendants for whom NCBF had posted cash bail complied with their appearance obligations, NCBF was able to obtain a full refund, even if the defendants owed outstanding fines or other debt to the court.

On May 6, 2019, however, the Criminal Court released an *en banc* Order, rescinding the exemption. (*Id.* ¶ 32) The court wrote that "several issues ha[d] arisen . . that ha[d] caused the Court to reconsider the NCBF's exemption." (Doc. No. 1-4 at 1.) First, the court noted, two judges of the court had retired, and their positions had been filled by two new Criminal Court judges who had not taken part in the consideration of the initial exemption order. Second, the court wrote that it had "been made aware by the Davidson County Criminal Court Clerk's Office that as of April 18, 2019, there are $104,200 in conditional forfeits on bonds posted by the

---

[4] The serious potential negative effects of failing to secure pretrial release—which go far beyond the temporary loss of liberty pending trial—are detailed in the court's Memorandum of March 17, 2020. (Doc. No. 22 at 6–8.)

NCBF." (*Id.* at 1–2.) The court explained that "[t]his level of exposure" was "far beyond what the Court contemplated" when the initial exemption had been granted. The court wrote that, "particularly in light of the amount of conditional forfeitures currently outstanding," it was "concerned by the NCBF's lack of sufficient and specific measures to ensure a defendant's appearance in court." (*Id.* at 2.)

NCBF requested that the court reconsider. (Doc. No. 1 ¶ 33.) On August 29, 2019, the court entered an *en banc* Order denying NCBF's petition. (*Id.*) The court "reaffirm[ed]" its earlier rationale for ending the exemption. (Doc. No. 1-5 at 2.) It added, however:

> [T]he Court notes that in no way does it intend for this Order to force the NCBF to shut down. As the Court stated at the hearing on July 18, 2019, this Court agrees with the NCBF's contention that the work in which they are engaged is a noble service to the community. The Court continually strives to ensure that the administration of the criminal justice system is fair and equitable for all parties, and is willing to work with the NCBF or any other organization to that end. However, while the Court hopes that the NCBF continues its work, for the aforementioned reasons, the Court is of the opinion that cash bails posted by the NCBF should not automatically be exempted from being used to satisfy the fines, costs, or restitution that other parties posting cash bails are generally required to satisfy. Of course, a defendant on a bond made by the NCBF, just like any other defendant, may still petition the appropriate court for waiver of any costs or fines based upon the defendant's indigency upon entry of any judgment against them. Bond funds paid by the NCBF would still be refunded if all costs, fines, and fees were waived by that court.

(*Id.* at 2–3.)

After the revised policy went into effect, the Clerk changed his policies and practices to treat NCBF in the same manner as any other party posting cash bail. Specifically, NCBF personnel are required to sign the Clerk's Form, acknowledging the Clerk's Office policy of refunding only the amounts of bonds remaining following the payment of fines, fees, and restitution. If the NCBF representative refuses to sign the Form, the Clerk will refuse to accept the payment. (Doc. No. 1 ¶ 34.) NCBF maintains that this revised policy has forced it to

10

substantially scale back its operations, including by declining to post bail for individuals whom it otherwise would have helped. (*Id.* ¶ 35.)

## D. This Litigation

On February 5, 2020, NCBF filed a Complaint for Injunctive and Declaratory Relief, in which it named, as the sole defendant, "Hon. Howard Gentry, Criminal Court Clerk, in his official capacity." (Doc. No. 1 at 1 (italics omitted).) NCBF pleaded three causes of action under 42 U.S.C. § 1983: first, for violation of the Eighth Amendment right against excessive bail; second, for violation of the Fourteenth Amendment, based on the imposition of unconstitutional release conditions; and, third, for violation of the Fourteenth Amendment right not to be subjected to a deprivation of liberty without due process. (*Id.* ¶¶ 62–78.) On the same day, NCBF filed a Motion for Preliminary Injunction, asking the court to enjoin Gentry "from (1) enforcing Davidson County Local Rule Governing Bail Bonds 10(B) as well as (2) enforcing his office's policy of conditioning the acceptance of cash bails on receipt of a signed form acknowledging future payment of criminal debts from that cash bail . . . ." (Doc. No. 3 at 1.)

On February 20, 2020, Gentry, represented by attorneys from the Department of Law of the Metropolitan Government of Nashville and Davidson County ("Metro Legal"), filed a Response opposing the Motion for Preliminary Injunction. (Doc. No. 15.) Gentry claimed that he was "enter[ing] this appearance exclusively in his capacity as an elected official for" Metro. (*Id.* at 1.) Gentry conceded, however, that, when he was carrying out the business of the Twentieth Judicial District and its bail system, he was acting, not in any capacity as a representative or agent of the Metro government, but rather as an agent of the State of Tennessee. (*Id.* at 1.) Nevertheless, the Clerk did not file any separate response in his state capacity, and no attorneys appeared to represent him in that capacity.

11

On February 27, 2020, the Clerk—still represented by Metro Legal and still purporting to be appearing only in a limited capacity—filed a Motion to Dismiss, asking the court to dismiss NCBF's claims, "insofar as the Court construes the claims as proceeding against Mr. Gentry in his capacity as a Metropolitan Government official." (Doc. No. 17 at 1.) He explained that his reason for drawing this distinction was that, in his view, he had never been properly served in his capacity as a state official, only as a local official. (Doc. No. 18 at 7–8.)

On March 17, 2020, the court denied the Motion to Dismiss and granted the Motion for Preliminary Injunction. (Doc. No. 23.) The court addressed and rejected various procedural issues that the Clerk had raised related to his supposed dual role as a state and local official and expressed disappointment that the Clerk had not yet obtained counsel empowered to represent him in his full official capacity. The court held that, while the Clerk was correct that the Twentieth Judicial District was an arm of the State of Tennessee, he was mistaken that he had no obligation to respond to the lawsuit in that capacity merely because service had—by his consent—been effected through Metro Legal. The court therefore did not dismiss any aspect of the action. The court also determined that the factors governing preliminary injunctions, including likelihood of success on the merits, favored granting an injunction prohibiting the Clerk from enforcing Rule 10(B) and the surrounding policies against NCBF. (Doc. No. 22 at 28–34.) In the wake of the court's ruling, Metro Legal withdrew from the case, and the Clerk obtained private counsel. (Doc. Nos. 25, 36–37.)

On May 21, 2020, the Clerk filed his Second Motion to Dismiss. (Doc. No. 47.) He argues that NCBF lacks standing to assert at least some of its claims, that he is entitled to judicial immunity, and that, if neither of those issues poses an obstacle to NCBF's claims, each of the

claims should be dismissed on the merits under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Id.* at 1.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Genetek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Genetek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 511.

However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6t Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Genetek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

### B. Rule 12(b)(6)

13

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Standing

**1. Scope and Nature of the Standing Requirement.** Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*,

14

504 U.S. 555, 560 (1992). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a)(i) concrete and (ii) particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

In their briefing, the parties to this case take markedly different approaches to the concept of standing. NCBF focuses almost exclusively on the core Article III requirements of standing: how NCBF, as an organization, was injured, how the Clerk caused that injury, and how that injury can be redressed. The Clerk, in contrast, acknowledges but largely sidesteps those traditional considerations and focuses on the "judicially self-imposed limits on the exercise of federal jurisdiction" that have, at times, been treated as part of the "blend of constitutional requirements and prudential considerations" going under the name of "standing." (Doc. No. 52 at 2 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). Each approach has some historical support, but neither, in fact, is up-to-date.

Prior to 2014, the caselaw largely resembled the Clerk's approach. Courts—including the Supreme Court, the Sixth Circuit, and this court—routinely repeated the premise that standing included both constitutional and prudential dimensions that combined into a unitary inquiry. That approach, though, had some notable weaknesses, both conceptually and practically. First and

foremost, it was never clear exactly how or why courts had the power to impose "prudential" limitations that contradicted the scope of jurisdiction conferred by the Constitution and Congress's jurisdictional statutes. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) (describing the "judicially self-imposed" components of standing as distinct from the "core component derived directly from the Constitution"). And if courts did have that power, what were its limits, and how was one to know what they were? *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (noting that the Supreme Court had never "exhaustively defined the prudential dimensions of the standing doctrine"). The mostly unacknowledged faults in the pre-2014 approach's foundations often resulted in exactly what the court sees here: parties talking past each other, seemingly debating the same issue but actually addressing themselves to distinct sets of concerns.

Fortunately, the Supreme Court, in *Lexmark International, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014), went a long way toward disentangling the actually quite distinct principles involved in this confusion. *Lexmark* involved the issue of "prudential standing" under the Lanham Act, and the parties on both sides had briefed it as such. *Id.* at 125. The Supreme Court, however, took the opportunity to "clarify[] the nature of the question at issue." *Id.* The Court noted that the very idea of a court prudentially deciding not to hear an otherwise appropriate case was in "some tension" with the established principle that the federal courts have an "'obligation to hear and decide' cases within [their] jurisdiction" that "'is virtually unflagging.'" *Id.* at 126 (quoting *Sprint Commc'ns*, 571 U.S. at 78). The Court concluded that the issue that the parties had raised—essentially a "zone of interests" inquiry of the type relevant to a number of federal causes of action—was not ultimately a question of standing at all, but rather a simple issue of statutory interpretation regarding the scope of the relevant Lanham Act

cause of action. *Id.* at 129. Accordingly, a court considering such an argument should rely on the "traditional tools of statutory interpretation" to ascertain whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue under" the relevant provision. *Id.* at 128.

In other words, *Lexmark* "clarified that prior decisions invoking the 'prudential standing' label had really asked a statutory-interpretation question: Does the specific statute give the specific plaintiff a right to bring the specific suit?" *In re Capital Contracting Co.*, 924 F.3d 890, 896 (6th Cir. 2019) (citing *Lexmark*, 572 U.S. at 128); *see also Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016) ("The Supreme Court has explained that the term 'statutory standing' describes an inquiry into the question whether a plaintiff 'falls within the class of plaintiffs whom Congress has authorized to sue' and therefore 'has a cause of action under the statute.' However, this label is 'misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.'") (quoting *Lexmark*, 572 U.S. at 128 & n.4). Although *Lexmark* was not itself a § 1983 case, there is no plausible basis for treating its analysis as inapplicable in the § 1983 context, given the pervasiveness of "prudential standing" issues in the § 1983 caselaw. *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388 n.9 (2d Cir. 2015) (acknowledging that prudential standing concerns in § 1983 cases are governed by *Lexmark*).

The parties' briefing on the issue of standing, therefore, raises two distinct issues. First, there is the jurisdictional question of whether NCLB can satisfy the minimum requirements of standing under Article III. This analysis, as the court has stated, is focused on NCLB's alleged injuries, those injuries' source, and whether this court can redress them. The second question raised by the parties' briefing is whether, as a substantive but non-jurisdictional matter, the cause

17

of action created by Congress in § 1983 contemplates that a party in NCLB's position will be permitted to sue to vindicate the rights it seeks to vindicate. The court will address both issues.

2. **Article III Standing.** As NCBF points out, its Article III standing in this case is apparent. The Clerk's Office wants to keep some of NCBF's money, and NCBF wants that money back. Even "[a] dollar of economic harm is . . . an injury-in-fact for standing purposes." *Johnson v. BLC Lexington, SNF, LLC*, No. CV 5:19-064-DCR, 2020 WL 3578342, at *2 (E.D. Ky. July 1, 2020) (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)). This is, moreover, not an instance in which the plaintiff organization's alleged monetary injury is self-inflicted through its own voluntary, speculative expenditures in reaction to the challenged policy. *See, e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, No. 20-6046, 2020 WL 6074331, at *7 (6th Cir. Oct. 15, 2020). Here, the government itself is routinely and intentionally keeping money that NCBF claims it has a right to. The injury-in-fact, in other words, is both fully realized and inflicted directly by the defendant.

There is no question that the Clerk is a cause of that harm; he is the one taking the money and refusing to return it. And there is no question that the injury is redressable; either injunctive or declaratory relief would redress the injury. Moreover, NCBF has plausibly pleaded additional harms, in addition to pure economic injury, including the interference in NCBF's operations and charitable model. The Clerk's argument, therefore, poses no serious challenge to NCBF's standing as a constitutional matter. Rather, it is the purely statutory type of "standing" that the Clerk actually appeals to.

3. **Direct "Standing" under § 1983.** Section 1983 creates a cause of action for "any citizen of the United States or other person within the jurisdiction thereof" who was subject to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of

18

the United States under the color of law. 42 U.S.C. § 1983. The Supreme Court has interpreted

that language as requiring that, "[i]n order to seek redress through § 1983, . . . a plaintiff must

assert the violation of a federal *right*, not merely a violation of federal law." *Blessing v.*

*Freestone*, 520 U.S. 329, 340 (1997) (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S.

103, 106 (1989)). Although the Clerk describes his arguments as challenges to standing, it is

really that principle on which his reasoning rests: the Clerk argues that most of the rights that

NCBF wishes to assert are not its rights but, if anything, the rights of individual defendants, and

NCBF, therefore, has not suffered the deprivation of a federal right for the purposes of § 1983.

As an initial matter, the court notes that the Clerk does not dispute that NCBF is an

appropriate plaintiff with regard to its third ground for relief, the alleged deprivation of property

without due process of law. That count is premised on NCBF's own right not to be deprived of a

property interest without appropriate procedural safeguards, as guaranteed by the Fourteenth

Amendment of the U.S. Constitution. Because that claim involves NCBF's own rights, NCBF is

an appropriate § 1983 plaintiff for its purposes.

The Clerk is correct, however, that NCBF's other two theories of liability hinge on

federal rights that the Constitution guarantees to defendants themselves, not necessarily to third

parties. The Eighth Amendment requires that "[e]xcessive bail shall not be required, nor

excessive fines imposed, nor cruel and unusual punishments inflicted." That text alone does not

explicitly establish whose rights, if any, the Amendment guarantees; it is, rather, simply a

prohibition. *Cf. Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418–19 (2016) (relying on

specific language of the First Amendment to determine whether plaintiff was within class of

plaintiffs whose activity was protected). NCBF, however, has provided no reason to doubt the

natural inference that the rights secured by the Eighth Amendment belong to the defendant in a

criminal proceeding, not to any third party. Such a reading is consistent with the fact that "excessive bail" appears alongside "excessive fines" and "cruel and unusual punishments"—two types of injuries directed at the criminal defendant. The Clerk's reading is also consistent with the language of the Amendment stating that excessive bail shall not be "required," as opposed to language more focused on the act of payment itself.[5] Bail is only a *requirement* with regard to one thing—the criminal defendant's release.

The Supreme Court has long recognized, in § 1983 cases, that, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted); *accord Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Justice Thomas, in his dissent in a notable recent First Amendment case, captured the nature of the distinction here, even if his reasoning did not ultimately become the holding of the Court:

> The mere fact that the government has acted unconstitutionally does not necessarily result in the violation of an individual's constitutional rights, even when that individual has been injured. Consider, for example, a law that authorized police to stop motorists arbitrarily to check their licenses and registration. That law would violate the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 661 (1979). And motorists who were *not* stopped might suffer an injury from the unconstitutional policy; for example, they might face significant traffic delays. But these motorists would not have a § 1983 claim simply because they were injured pursuant to an unconstitutional policy. This is because they have not suffered the right kind of injury. They must allege, instead, that their injury amounted to a violation of their constitutional right against unreasonable seizures—that is, by being unconstitutionally detained.

---

[5] For example, the Amendment could state that "no person shall be made to pay excessive bail to secure the release of a person charged with a crime."

*Heffernan*,136 S. Ct. at 1422 (Thomas, J., dissenting).[6] While the majority in *Heffernan* did not agree with Justice Thomas on the underlying First Amendment issue, nothing in the opinion appears to reject the general rule that a § 1983 claim should arise out of a deprivation of the plaintiff's own federal right. The general rule, therefore, would suggest that NCBF's first two counts should have been brought by one or more of its clients, not NCBF itself.

The Supreme Court, however, has also been clear that the general rule that a § 1983 plaintiff should be asserting his own rights is far from "absolute"; quite to the contrary, its caselaw in this area has been, in the Court's own words, "quite forgiving" in the finding of exceptions allowing third parties to pursue § 1983 claims. *Kowalski*, 543 U.S. at 130. That flexibility, moreover, must now be understood in terms of *Lexmark*'s recontextualization of "prudential standing" inquiries in terms of statutory construction, which makes clear that the exercise of the court's power in any given case is guided, not by the court's own evaluation of prudential concerns, but by the statute itself.

The Supreme Court, in its application and interpretation of § 1983, has already held that the statute, at least *sometimes*, permits claims by an injured party other than the individual deprived of his federal right. The court, therefore, must determine whether this might be such an instance, or whether the cause of action enacted by Congress would allow only the individuals whom NCBF serves to raise a § 1983 claim based on excessive bail or impermissible bail conditions.

**4. Third-Party "Standing" Under § 1983.** At least generally speaking, "a party seeking third-party standing [must] make two additional showings. First, . . . the party asserting the right" must show that it "has a 'close' relationship with the person who possesses the right. Second,"

---

[6] Notably, Justice Thomas specifically identified this § 1983 issue as governed by *Lexmark*. *Heffernan*,136 S. Ct. at 1422 (Thomas, J., dissenting)

the party must show that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). The Clerk argues that NCBF cannot establish either of these requirements; he argues that NCBF's relationships with its program participants is not sufficiently "close" to permit it to sue on behalf of their rights and that the program participants are not hindered from asserting their rights themselves.

The Clerk bases his argument that NCBF lacks a close relationship with the defendants whose rights it wishes to assert primarily on the Supreme Court's opinion in *Kowalski v. Tesmer* and the Third Circuit's interpretation of *Kowalski* in *Holland v. Rosen*, 895 F.3d 272 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 440 (2018). In *Kowalski*, plaintiff attorneys sought to pursue third-party claims on behalf of hypothetical future indigent clients who would be denied the right to a criminal appeal under the challenged policy. 543 U.S. at 130. The Supreme Court held that the attorneys did not have third-party standing, in part because the hypothetical future defendants at issue were unidentified and were not yet in any attorney-client relationship with the plaintiffs. *Id.* at 131. In *Holland*, the Third Circuit expanded the reasoning of *Kowalski* to bar third-party standing by a bail bondsman seeking to assert the rights of hypothetical future customers, on the ground that the "hypothetical relationship with potential customers closely mirrors that of attorneys with potential clients." *Holland*, 895 F.3d at 288.

As NCBF points out, however, its relationship with its program participants is fundamentally different from that of a compensated attorney or a for-profit bonding company with its paying clients. When discussing who may seek to vindicate a constitutional right,[7] the

---

[7] Many of the cases in which the Supreme Court has addressed the question of when a third party may assert a constitutional right have not been § 1983 cases, but rather, for example, cases considering petitions for habeas corpus or appeals of criminal convictions. The Clerk, however, does not argue or

22

Supreme Court has expressly distinguished between "the fortuitous connection between a vendor and potential vendees"—which generally will not support third-party standing—and the "relationship between one who act[s] to protect the rights of a" class of person and the individuals in the class of person protected. *Eisenstadt v. Baird*, 405 U.S. 438, 445 (1972). NCBF is a mission-driven charitable entity that serves and advocates for its participants as beneficiaries, not customers. As a result, NCBF's interests are closely aligned with its participants', particularly with regard to the issues raised in this litigation.

The term "close relationship," in the context of third-party standing, does not focus on the parties' "closeness" in some generic interpersonal sense, but instead on whether "the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976). That is why, for example, a criminal defendant can be said to have a close relationship with a juror improperly excluded from his trial—despite neither person's even knowing the other—due to their "common interest in eliminating racial discrimination from the courtroom." *Powers*, 499 U.S. at 413. The relationship between NCBF and its program participants is such that NCBF is at least as effective a proponent of their rights regarding the bail conditions at issue here as they would be. NCBF's relationship to its participants is therefore sufficiently close, as the term is used in this context, to allow it to assert a § 1983 claim based on their rights, if there is some hindrance that would make them ineffective in doing so themselves.

Some examples of obstacles that have been held to be sufficient hindrances to permit third-party standing include "deterrence from filing suit due to privacy concerns, imminent mootness of a case, or systemic practical challenges to pursuing one's own rights." *Moody v.*

---

offer any basis for concluding that the third-party standing principles incorporated into § 1983 are any more restrictive than those in these other settings.

*Mich. Gaming Control Bd.*, 847 F.3d 399, 402–03 (6th Cir. 2017) (citing *Powers*, 499 U.S. at 414 ); *Singleton*, 428 U.S. at 117; *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 207 (6th Cir. 2011) (collecting cases)). The hindrance analysis, in other words, allows the court to consider obstacles both legal and practical, and a hindrance is not required to be an absolute bar to seeking relief in order to be sufficient.

The potential hindrances facing NCBF's participants in the assertion of their rights regarding excessive bail and unconstitutional release conditions are substantial. First, all of those participants, by definition, have extremely limited resources. NCBF, at least according to its Complaint, is an organization specifically dedicated to ameliorating the effects of poverty in the criminal justice system; it is presumably not in the business of helping those who do not need its help. NCBF's program participants, therefore, would largely lack the resources to pursue civil litigation against the Clerk. Second, individual plaintiffs would face substantial obstacles from the various doctrines that insulate state court proceedings from meddling by collateral federal litigation. While this court may have authority to issue declaratory or injunctive relief directed at the Clerk's policies at the general level, it is considerably more questionable—to say the least— whether this court could actually intervene in any individual defendant's criminal case. *See, e.g., Doe v. Univ. of Ky.*, 860 F.3d 365, 369 (6th Cir. 2017) (explaining that *Younger* abstention is permitted where necessary to avoid intervening in "an ongoing state criminal prosecution"); *Lawrence v. Welch*, 531 F.3d 364, 371–72 (6th Cir. 2008) ("[C]laims seeking injunctive relief are barred . . . if they necessarily require the federal court to determine that a state court judgment was erroneously entered.").

The potential for mootness would also potentially hinder a claim from such an individual, as his period of pretrial release might end during litigation, leaving him with no redressable

24

injury. *See Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011) ("If events occur during the case, including during the appeal, that make it 'impossible for the court to grant any effectual relief whatever to a prevailing party,' the appeal must be dismissed as moot.") (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). Finally, it is not clear why such a person would even bring a claim, given that it is NCBF, not the individual criminal defendant, who is being deprived of refunded money. There is little, if any, incentive for an individual plaintiff to devote the time and resources necessary for civil litigation. The same lack of incentive would also strongly weigh against a defendant's asserting his rights through a direct state appeal, insofar as one would be available.

There are, in short, very serious questions regarding whether anyone other than NCBF offers any practical likelihood of vindicating the rights at issue here, and NCBF is itself well-situated, relative to the individuals whose rights are at stake, to advocate for those rights. Under Supreme Court and Sixth Circuit precedent regarding third-party standing, such a plaintiff, if he was injured by the deprivation of a federal right, has a cause of action under § 1983, even if it is not strictly *his* federal right that was violated. The court therefore will not dismiss any of NCFBF's counts on that ground.[8]

## **B. Judicial Immunity**

"It is well-established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions." *Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012)

---

[8] Because the court has held that NCBF has, at least at this stage, established that it is entitled to third-party standing, the court is not required to determine whether there is an independent basis for finding standing under the rubric of "organizational" or "associational" standing. *See Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006). The court notes, though, that conventional associational standing may present a somewhat difficult fit for this case, because the relevant caselaw typically speaks in terms of an organization's "members," and it is not clear that NCBF's relationship to its program participants falls neatly onto the concept of membership. Nevertheless, the facts may ultimately reveal that the associational relationship provides an additional basis for NCBF's § 1983 claims.

25

(quoting *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004); citing *Mireles v. Waco*, 502 U.S. 9, 11 (1991)). "Moreover, absolute judicial immunity has been extended to non-judicial officers," such as court administrators "who perform 'quasi-judicial' duties." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (citing *Joseph v. Patterson*, 795 F.2d 549, 560 (6th Cir. 1986); *Johnson v. Granholm*, 662 F.2d 449 (6th Cir. 1981)).

As NCBF has pointed out, the Supreme Court has held that judicial immunity, as traditionally understood, "is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" under § 1983. *Pulliam v. Allen*, 466 U.S. 522, 541–42 (1984); *accord Raymond v. Moyer*, No. 2:05-cv-1157, 2006 WL 1735368, at *3 (S.D. Ohio June 22, 2006). However, § 1983 itself expands the scope of judicial immunity, for the purposes of that cause of action, by stating that, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." The Prayer for Relief in NCBF's Complaint includes a number of requests for declaratory relief. (Doc. No. 1 at 28–29.) Therefore, neither traditional principles of judicial immunity nor § 1983's expanded restrictions related to judicial officers would be wholly fatal to NCBF's claims. At most, the court could dismiss the claims in part, insofar as NCBF seeks any relief other than declaratory relief (or, if necessary, injunctive relief after the declaratory decree was violated).

In any event, NCBF argues that the Clerk is not entitled to judicial immunity in this case at all, because the underlying actions he took were administrative, not judicial, in nature. Even judges themselves "are not entitled to absolute immunity when acting in their administrative capacity." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993) (citing *Forrester v. White*, 484 U.S. 219, 229 (1988)). "[T]he paradigmatic judicial act is the resolution of a dispute

26

between parties who have invoked the jurisdiction of the court." *Morrison v. Lipscomb*, 877 F.2d 463, 465 (6th Cir. 1989) (citing *Forrester*, 484 U.S. at 226). Outside of that core judicial function, however, the court must engage in a close analysis to determine whether the act of a judge (or other court official, such as a clerk) is sufficiently closely related to judging to warrant immunity. In so doing, the court considers "the nature of the function at issue and not merely . . . the identity of the actor or the harm caused." *Watts v. Day*, 129 F. App'x 227, 232 (6th Cir. 2005) (citing *Lomaz v. Hennosy*, 151 F.3d 493, 497 (6th Cir. 1998)).

This inquiry typically includes two components: "First, a court must determine whether an act is related to those general functions that are normally performed by a judicial officer. Second, a court must assess whether the parties expected to deal with the judicial officer in the officer's judicial capacity." *Cooper v. Parrish*, 203 F.3d 937, 945 (6th Cir. 2000) (citing *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)). The courts have identified certain "factors 'characteristic of the judicial process'" that would support an inference that an official was acting in a judicial capacity, including "the importance of precedent; . . . the adversary nature of the process; and . . . the correctability of error on appeal." *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 348 (6th Cir. 2015) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)).

The Clerk's actions in this case involve essentially two sets of responsibilities: first, the Clerk promulgates and requires the collection on certain paperwork—namely, the Clerk's Form; and, second, the Clerk acts as, effectively, a bursar, accepting and refunding payments out of a fund over which he is entrusted authority and for which he performs some basic accountancy. Other than the fact that courts do sometimes use forms in connection with adjudication, neither

27

of those functions bears much resemblance to the core activity of judging, whereas each is a commonplace feature of ordinary, non-judicial public administration.

With regard to the second half of the functional inquiry, there is at least currently no basis on the record for assuming that a person who goes to the Clerk's Office to fill out the necessary forms to post bail, or who is seeking to recoup bail previously paid, expects to deal with a judicial officer acting in a judicial capacity. By that point, the bail amount and any other release conditions will already have been set through an adversarial, adjudicatory process involving a judge's (or at least a judicial commissioner's) exercise of discretion. The simple making of payment is exactly the type of "clerical" transaction that Tennessee statute entrusts to clerks, not judges. Tenn. Code Ann. § 18-1-101.

It is, moreover, immaterial that the Clerk, in taking the underlying actions, purports to be carrying out a policy set by judges in the form of Rule 10(B). The scope of immunity depends on the function being performed, not the title of the person or people who originated the policy. *See Watts*, 129 F. App'x at 232. Indeed, the Sixth Circuit has suggested that across-the-board rulemaking by judges is, in fact, one of the types of action that is more likely to be held to be administrative in nature, because it "is not an adjudication between parties," and it is "not connected to any particular litigation" but rather involves "instruct[ing] court personnel on how to process the petitions made to the court."[9] *Morrison*, 877 F.2d at 466.

_____

[9] Similarly unavailing is the Clerk's argument that he is an inappropriate defendant because he is merely carrying out a policy set by the judges of the judicial district and therefore should not be held responsible for his actions. As the court explained previously, the fact that the defendant, as the head of the Clerk's Office, is enforcing a policy set by someone else—whether the judges or the General Assembly—is simply not a defense to a cause of action for injunctive or declaratory relief against the head of a government body. What the Clerk is describing is a run-of-the-mill *Ex parte Young* claim, of the type routinely considered by the courts. (Doc. No. 22 at 26 (discussing *Ex parte Young*, 209 U.S. 123 (1908)).) *See Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018).

28

Absolute judicial immunity "is recognized only sparingly, and the official seeking the immunity bears the burden of showing that his actions are entitled to such absolute protection." *Lomaz*, 151 F.3d at 497 (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)). The chief purpose of that immunity is not simply to shield court employees from unwanted litigation, but to protect "the independent and impartial exercise of judgment vital to the judiciary." *Antoine*, 508 U.S. at 435. The Clerk has not shown that any of his actions at issue in this case implicates the independence or impartiality of the judicial process or that he can satisfy any test set forth in the caselaw entitling him to immunity. The court, therefore, will not dismiss NCBF's claims in any respect on that ground.

## C. Eighth Amendment Claim

As the court has already explained, the Eighth Amendment of the U.S. Constitution forbids a court from conditioning a criminal defendant's pretrial release on the payment of "excessive bail," which has been interpreted to mean bail greater than the amount "reasonably calculated to" provide "adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack*, 342 U.S. at 5. For its first cause of action, NCBF alleges that, "[t]hrough enforcement of Rule 10(B) and his own garnishment policy, [the Clerk] violates the Eighth Amendment rights of all accused persons in the Nashville Criminal Courts" by subjecting those defendants to a monetary bail condition—consent to and liability for potential future garnishment—over and above what was calculated as necessary to serve the constitutionally permissible purposes of bail. (Doc. No. 1 ¶ 66.)

NCBF's argument relies in significant party on the reasoning set forth by Justice Douglas for the Supreme Court in *Cohen v. United States*, 82 S. Ct. 526 (1962) (Douglas, J., in

chambers[10]). In *Cohen*, the Court concluded that bail pending appeal that is conditioned on the payment of the defendant/appellant's fine is "'excessive' in the sense of the Eighth Amendment because it would be used to serve a purpose for which bail was not intended." *Id.* at 529; *see also United States v. Rose*, 791 F.2d 1477, 1480 (11th Cir. 1986) ("We have no doubt that the addition of any condition to an appearance bond to the effect that it shall be retained by the clerk to pay any fine that may subsequently be levied against the defendant after the criminal trial is over is for a purpose other than that for which bail is required to be given under the Eighth Amendment. Such provision is therefore excessive and is in violation of the Constitution."); *United States v. Powell*, 639 F.2d 224, 225 (5th Cir. 1981) ("[W]e [have] rejected the government's argument that the fine should be paid out of bail money because the United States, as a creditor, has the same right as other creditors to apply a debtor's money in its possession to extinguish debts due."); *cf. State ex rel. Baker v. Troutman*, 553 N.E.2d 1053, 1056 (Ohio 1990) (adopting similar reasoning under the Ohio Constitution). NCBF's argument, echoing *Cohen*, is fairly straightforward: the Eighth Amendment permits the Twentieth Judicial District to require no bail in excess of what is required to reasonably ensure a defendant's appearance; the garnishment policy is not necessary to ensure appearance and therefore represents the surrender of a right in excess of the constitutionally permissible bail amount; and the Clerk's policies are, therefore, unconstitutional under the Eighth Amendment.

The Clerk argues, first, that this count should be dismissed "because the excessive bail clause does not guarantee the right to post a cash bail bond by a defendant, much less a third

_____

[10] An "in chambers" opinion is an opinion written and issued by a single judge of a multi-judge court, pursuant to a court rule allowing a lone judge to address certain secondary matters without obtaining concurrence from the full court or a panel thereof. *See* Daniel M. Gonen, *Judging in Chambers: The Powers of a Single Justice of the Supreme Court*, 76 U. Cin. L. Rev. 1159, 1173 (2008). In *Cohen*, Justice Douglas was addressing the issue of the bond amount set for a defendant pending appeal, which he was permitted to do without seeking concurrence of the other members of the Court. 82 S. Ct. at 527.

party." (Doc. No. 48 at 14.) As NCBF points out, however, nothing about its claim hinges on such a guarantee. The availability of bail in non-capital cases, as the court has explained, is a guarantee of Tennessee law and, therefore, is not an appropriate basis for a § 1983 claim. Similarly, the option to pay cash bail is a creation of state statute, and there is no basis for litigating the relevant statutes, in and of themselves, in federal court. What the U.S. Constitution requires—and what therefore can be the basis for a § 1983 claim—is that the State of Tennessee, having adopted a system of pretrial release pursuant to bail, limit any bail amount required to an amount that would not be "excessive," as the term has been construed in constitutional caselaw. *See Fields*, 701 F.3d at 184 ("[T]he Eighth Amendment mandates that when bail is granted, it may not be unreasonably high in light of the government's purpose for imposing bail."). The Clerk's first argument, in other words, is not directed at any principle that NCBF has advanced.

The Clerk argues, next, that the court should dismiss this claim because the Twentieth Judicial District's garnishment policy does not amount to an unconstitutional precondition on bail of the type prohibited by *Cohen*. In *Cohen*, Justice Douglas had granted a criminal appellant, Meyer Harris Cohen, bail in the amount of $100,000 during the pendency of his appeal, conditioned on the approval of the district court. The district court modified the bail to state that "of the $100,000 bail it be provided that $30,000 thereof be applicable to the payment of the fine" assessed against Cohen for his conviction. *Cohen*, 82 S. Ct. at 527. Cohen appealed, and Justice Douglas, acting on behalf of the Court, rejected the condition as in violation of the Eighth Amendment and the relevant Federal Rule of Criminal Procedure. *Id.* Justice Douglas wrote that "a requirement that the bail bond . . . should also operate as a supersedeas to a judgment for the payment of a fine" would "'ma[k]e the bail required excessive' . . . in the sense of the Eighth

Amendment because it would be used to serve a purpose for which bail was not intended." *Cohen*, 82 S. Ct. at 528 (quoting *Cain v. United States*, 148 F.2d 182, 183 (9th Cir. 1945)).

The Clerk is correct that this case does not present the precise situation covered by *Cohen*, because Cohen's bail was being applied toward the payment of a fine already assessed, whereas NCBF's program participants are being forced to have their bail applied toward potential fines, fees, and costs *to be* assessed. The court, however, sees no reason why that distinction would be of any importance for Eighth Amendment purposes. What matters, for the purposes of *Cohen*—and, even aside from *Cohen*, for the purposes of the Excessive Bail Clause—is whether all or a portion of the bail is being applied for the improper purpose of collecting fines or other costs, rather than ensuring appearance.

The Twentieth Judicial District's system, as it currently exists, functions like this: a court sets what it determines is an appropriate dollar figure to be posted as bail to secure the defendant's release; that dollar figure is communicated to the Clerk, whose job it is to take and look after the money; but, then, when NCBF comes to post bail, it is required to surrender not merely the dollar figure determined by the court, but also an additional, valuable asset—the consent to garnishment—that was not included in any calculation of what was necessary to ensure the defendant's appearance in court. In other words, NCBF is being required to transfer a thing of value that is literally *in excess of*—meaning "in surplus to"—the bail amount calculated to be necessary. The plain language of the Eighth Amendment prohibits such a practice.

Although *Cohen* itself is merely an "in chambers" opinion and does not appear to have a significant history of being applied in this circuit, the Sixth Circuit has continued to affirm that the purpose of money bail is to "ensure the appearance of the . . . defendant" and that "'[t]he fixing of bail for any individual defendant must be based upon standards relevant to the purpose

32

of assuring the presence of that defendant.'" *Fields*, 701 F.3d at 184 (quoting *Stack*, 342 U.S. at 5). A court may, to that end, enact certain uniform bail policies, as long as those policies are justified in relation to the traditional purposes of bail. *Id.* At least at this stage, however, the Clerk has identified no basis for concluding that the Twentieth Judicial District's garnishment policy is supported by those traditional purposes. To the contrary, the most plausible explanation for the policy is that it is a mere fiscal convenience, allowing the court to recover money owed without going through the steps of the ordinary civil collections process. *See* Tenn. Code Ann. § 40-24-105(a); Tenn. R. Civ. P. 69.05–.07; Tenn. Op. Att'y Gen. No. 06–135 (Aug. 21, 2006) (explaining that civil collection tools are available for the collection of criminal court debt). It will always be easier to have a debt satisfied by just reclassifying money that one already possesses than to seek the money elsewhere, especially where the money's otherwise rightful owner has been forced to sign a document prospectively agreeing to the reclassification. That fiscal convenience, however, has no relationship to the traditional purposes of bail, and the Twentieth Judicial District, therefore, exceeded the boundaries of permissible bail under the Eighth Amendment by including such conditions in its uniform bail policy. The court therefore will not dismiss this claim.

## D. Unconstitutional Conditions Claim

"[T]he Fourteenth Amendment 'forbids the government to infringe 'fundamental' liberty interests . . . , no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). This guarantee, which touches on an array of subject matters, *see Bell v. Wolfish*, 441 U.S. 520, 534 (1979) (collecting cases), is often discussed as involving "substantive due process"—the principle that some "fundamental rights and liberties"

are recognized by the constitutional due process as so in need of protection that no procedure, alone, can be adequate to guard against their deprivation, unless the substantive basis for the deprivation is itself sufficiently precise and directed toward a sufficiently important purpose. *Glucksberg*, 521 U.S. at 721. Based on those principles, NCBF, as its second claim for relief, alleges that "[a]n arrested person has a constitutionally protected fundamental liberty interest in pretrial release," and the Twentieth Judicial District's garnishment scheme amounts to a restriction on that right that "is not narrowly tailored to promote a compelling government interest." (Doc. No. 1 ¶¶ 69, 71.)

In *United States v. Salerno*, which involved an ultimately unsuccessful challenge to Bail Reform Act, the Supreme Court recognized the "general rule," under substantive due process principles, "that the government may not detain a person prior to a judgment of guilt in a criminal trial" unless that detention satisfies what appears, in that opinion, to be a heightened level of constitutional scrutiny—although the precise holding of *Salerno* in that regard is not entirely clear. *Salerno*, 481 U.S. at 749. The Supreme Court stressed, however, that it acknowledged "the importance and fundamental nature of" a defendant's right to physical freedom from incarceration prior to conviction. *Id.* at 750. The court, moreover, explicitly considered the "compelling" nature of the government's interest in the pretrial policies challenged in *Salerno*, as well as "Congress' careful delineation of the circumstances under which detention will be permitted." *Id.* at 749–50. At the very least, therefore, *Salerno* suggests that pretrial detention must pass a test relatively similar to the test used in other settings involving fundamental rights. *See Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (discussing "*Salerno*'s heightened scrutiny").

34

*Salerno* acknowledged a number of constitutionally permissible types of detention of individuals without a conviction, particularly those involving risk of harm to the public or the risk of absconding before trial or deportation. *Id.* at 748–69 (citing *Addington v. Texas*, 441 U.S. 418 (1979) (commitment based on mental illness); *Gerstein v. Pugh*, 420 U.S. 103 (1975) (pretrial detention); *Jackson v. Indiana*, 406 U.S. 715, 731–39 (1972) (detention of incompetent criminal defendant awaiting becoming competent); *Greenwood v. United States*, 350 U.S. 366 (1956) (same); *Wolfish*, 441 U.S. at 534 (pretrial detention); *Carlson v. Landon*, 342 U.S. 524, 537–42 (1952) (detention pending deportation); *Wong Wing v. United States*, 163 U.S. 228 (1896) (same)). The Clerk, however, has not identified any relationship between the policy of mandatory consent to garnishment and the interests of public safety or ensuring appearance. To the contrary, as the court has already discussed, the purpose of the garnishment policy appears to be fundamentally pecuniary: garnishment is simply the easiest way to collect money owed to the court.

The Supreme Court recently addressed whether the government's interest in recouping funds owed to it is sufficient to permit a challenged law to survive strict scrutiny. In *Barr v. American Association of Political Consultants*, 140 S. Ct. 2335 (2020), the Court considered the constitutionality of the "government debt exception" to the federal prohibition on robocalls to mobile phones and home phones. *Barr*, 140 S. Ct. at 2343. The Court's analysis of the issue of compelling purpose was short, however, because even the government itself conceded that the argument was, at least in that posture, a non-starter. The Court wrote:

> The Government concedes that it cannot satisfy strict scrutiny to justify the government-debt exception. We agree. The Government's stated justification for the government-debt exception is collecting government debt. Although collecting government debt is no doubt a worthy goal, the Government concedes that it has not sufficiently justified the differentiation between government-debt collection speech and other important categories of robocall speech, such as

35

> political speech, charitable fundraising, issue advocacy, commercial advertising, and the like . . . .

*Barr*, 140 S. Ct. at 2347; *see also Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974) (rejecting fiscal savings as a sufficient basis for justifying constitutionally suspect policy). Here, as well, there is no basis for concluding that the government needs to rely on garnishment so badly that it justifies impinging on a right as important as physical freedom from detention. A factual record may illuminate the strength of the government's interest in the garnishment policy, as well as whether more narrowly tailored alternative policies are available. At this stage, however, NCBF was required only to plead a plausible claim on which relief can be granted.

Finally, the Clerk argues that, even if one generally accepts NCBF's constitutional analysis, the Clerk's garnishment policy is not, in fact, unconstitutional, because a defendant's release is not actually conditioned on garnishment. (Doc. No. 48 at 7.) Specifically, the Clerk claims that, if a defendant can simply afford a commercial bail bonding company that will post a surety bond, rather than a cash bail, then no garnishment will occur. This argument is unavailing for at least two reasons. First, it hinges on factual details about Clerk's Office policies that are outside the four corners of the Complaint and are therefore inappropriate for consideration under Rule 12(b)(6). Second, and perhaps more importantly, it is not clear to the court why the Clerk's policy of not garnishing bail in some situations can constitutionally redeem its mandatory garnishment in other situations. NCBF has not challenged the Clerk's treatment of individuals who post surety through commercial bonding companies, only those who post cash bail through NCBF. Because it has set forth a plausible claim for relief in that regard, the court will not dismiss its claim.

**E. Claim Based on Deprivation of Liberty Without Due Process**

"The Fourteenth Amendment of the United States Constitution protects individuals from the deprivation 'of life, liberty, or property, without due process of law.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1). That language has been construed to "require[] that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). For its third cause of action, NCBF alleges that, "[w]hen [the Clerk] garnishes cash bail deposits made by third parties, those third parties are not given notice or an opportunity to be heard by a neutral decisionmaker prior to garnishment," in violation of that guarantee.

The Clerk argues, first, that the court should dismiss this claim because NCBF does not have a property interest in the funds it posts as cash bail for its program participants. The Clerk relies on Tenn. Code Ann. § 40-11-118(a), which states, in relevant part:

> Any defendant for whom bail has been set may execute the bail bond and deposit with the clerk of the court before which the proceeding is pending a sum of money in cash equal to the amount of the bail. Upon depositing this sum, the defendant shall be released from custody subject to the conditions of the bail bond.

The Clerk argues that this provision discusses only the defendant himself posting cash bond, not a third party such as NCBF, suggesting that, regardless of who posts cash bail, the cash bail belongs to the defendant. The right to recover the funds, the Clerk argues, therefore belongs to the defendant alone.

The Clerk's position is, among other things, directly contrary to the position set forth on his own Clerk's Form, which requires the signatory to acknowledge, "I further understand *the person tendering the cash bond is due the refund*, upon request, once all fines, fees, court costs, taxes, and restitution are satisfied." (Doc No. 1-3 at 2 (emphasis added).) That form, moreover, is

promulgated by the Clerk pursuant to Rule 10(B), which directs that "*[a]ny individual who desires to deposit a cash bond* with the Clerk pursuant to [Tenn. Code Ann.] §40-11-118 shall be notified in writing by the Clerk that such cash deposit *shall be returned* subject to any fines, court costs or restitution as ordered by the Court." (Doc. No. 1-2 at 10 (emphasis added).) Therefore, insofar as there is any question whether the state's statutes recognize the property interest of a third party who posted cash bail, it is clear that the Twentieth Judicial District's own rules do.

In any event, however, the Tennessee Supreme Court has already squarely addressed the issue of whether a third party that posts bail money can retain a property right in that money and concluded that it can. In *State v. Clements*, 925 S.W.2d 224, 226 (Tenn. 1996), the court considered whether a court could garnish the bail posted by a father for his son without the father's assent and concluded that it could not. The court specifically rejected the argument, revived by the Clerk here, that "funds . . . deposited on [a] defendant's behalf" should be "treated as his property." *Id.* at 225.

The Clerk argues next that NCBF cannot state a claim for deprivation of due process because its signing of the Clerk's Form was effectively a waiver of any right on its behalf to a hearing. The Clerk's Form, however, is a take-it-or-leave-it proposition: one can sign the form or one can be refused the opportunity to post bail. The Clerk has not identified any source for concluding that this kind of mandatory prospective waiver is a suitable substitute for a right to a hearing before (or at least after) a party is deprived of a property right. To the contrary, such an argument would seem to run directly afoul of the principle that the "unconstitutional conditions doctrine . . . prohibit[s] the government from conditioning benefits on a citizen's agreement to surrender due process rights." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th

Cir. 2005) (citing *Vance v. Barrett*, 345 F.3d 1083, 1089 (9th Cir. 2003)). The government cannot simply eliminate all due process rights in a program by requiring a waiver as the price of admission.

Finally, the Clerk argues that it is simply factually untrue that NCBF lacks an opportunity for a contested hearing seeking the return of its funds. That may be the case, and, if so, it may be fatal to NCBF's claim. At this stage, however, the court is bound to accept, as true, the allegations of its Complaint. NCBF has alleged as follows:

> Beginning on September 30, 2019, NCBF representatives requested a pre-garnishment hearing in writing on the Clerk's Form approximately thirty times that they posted bail. Rather than providing any forum for a hearing, Gentry ignored these requests. Instead, his staff simply notified the NCBF that pursuant to Rule 10(B), he will automatically take any amount owed by an NCBF participant out of the cash bail deposit when a refund request is made and processed.

(Doc. No. 1 § 57; *see also* id. § 20 ("[T]here is no forum in which the NCBF can contest the garnishment of its deposited funds to satisfy . . . a judgment.") The court will not wade into speculation or premature consideration of factual issues regarding alternative methods that NCBF might have pursued that might have resulted in a hearing. At this stage, NCBF's obligation was merely to plausibly state an alleged violation of the relevant constitutional guarantee, and it has done so. The court therefore will not dismiss its claim.

## V. CONCLUSION

For the foregoing reasons, the Clerk's Second Motion to Dismiss (Doc. No. 47) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

39